OPINION OF THE COURT
Joseph Jaspan, J.
The defendant moves for an inspection of the Grand Jury minutes and a consequent dismissal of the indictment against him.
The fact pattern as presented to the Grand Jury indi *298 cates that in three separate and specified instances the defendant, a practicing attorney, was consulted by a married couple seeking a child for adoption and coincidentally, but not simultaneously, by a pregnant young lady seeking his help in placing an unwanted baby. The resulting physical transfer of the child took place in each case in the parking lot outside the hospital after payment by the prospective parents to the defendant of sums ranging from $7,000 to $9,000 to cover "fees” and confinement expenses. These sums were paid partly in cash and partly by check in accordance with the specific requests of the defendant. The hospital expenses were computed to range between $1,024 and $1,756, the latter amount involving one set of twins. In one of the three cases, the defendant handled the adoption, in a second he retained counsel at a cost of $500 and in the third, the adoptive parents retained and separately paid their own attorney the sum of $1,000. At this point in the proceedings a portion of the fees may be found to be charges for placement and not solely for services rendered as an attorney plus out-of-pocket expenses.
The indictment charges violations of two sections of the Social Services Law (§ 374, subds 2, 6) and grand larceny in the second degree with respect to each of the three placements.
Subdivisions 2 and 6 of section 374 of the Social Services Law read as follows:
"2. No person, agency, association, corporation, institution, society or other organization except an authorized agency shall place out or board out any child but the provisions of this section shall not restrict or limit the right of a parent, legal guardian or relative within the second degree to place out or board out a child.”
"6. An authorized agency, as defined in paragraph (a) of subdivision ten of section three hundred seventy-one of this chapter, may charge or accept a fee or other compensation to or from a person or persons with whom it has placed out a child, for the reasonable and necessary expenses of such placement; and no agency, association, corporation, institution, society or organization, except such an authorized agency, and no person may or shall request, accept or receive any compensation or thing of value, directly or indirectly, for placing out a child; and no person may or shall pay or give to any person or to any agency, association, corporation, institu *299 tion, society or organization, except such an authorized agency, any compensation or thing of value for placing out a child.
"This subdivision shall not be construed to prevent the payment of salaries or other compensation by an authorized agency to the officers or employees thereof; nor shall it be construed to prevent the payment by a person with whom a child has been placed out of reasonable and actual medical fees or hospital charges for services rendered in connection with the birth of such child, if such payment is made to the physician or hospital who or which rendered the services or to the natural mother of the child, or to prevent the receipt of such payment by such physician, hospital or mother.”
"Place out” is defined in subdivision 12 of section 371 as the "arrange[ment] for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care” (emphasis added).
Defendant is not an authorized agency as defined in subdivision 10 of section 371 of the Social Services Law nor do his activities fall within the provisions of subdivision 12 of section 371 set forth above.
He claims that as an attorney he acted as an "intermediary” and had a legal right to assist a mother in placing out her child. Defendant relies on a 1925 State Attorney-General opinion (35 NY St Dept Rep 238) which states that the use of intermediaries between parents and prospective foster parents are not restricted by section 303 of the former State Charities Law. He also cites a 1949 Report of the Joint Legislative Committee on Interstate Co-operation (NY Legis Doc, 1949, No. 62) which stated that New York State law permits (p 49) "placements by parents, guardians or relatives within the second degree, or by intermediaries, acting on behalf of the parent or guardian.” (Emphasis added.)
But this legislative report points out that the existing law as then interpreted "has given rise to what is popularly known as the 'black market’ in babies”. It notes that where a voluntary or independent placement "involves the payment of money in consideration of the placement, they are commonly referred to as 'black market’ or bootleg placements and should be prohibited”.
The major 1949 amendment was to subdivision 12 of section *300 371 of the Social Services Law and extended the limitations on placements to include "for the purpose of adoption”.
The 1949 amendments to the former Social Welfare Law were designed to prohibit "arrangements” made for the unauthorized placing out of a child and particularly the business which might arise from such placements (People v Scopas, 11 NY2d 120, 126).
The defendant’s status as an "intermediary” is tainted by the "fees” charged and the number of instances in which he was so involved.
In Scopas, the adoption took place in Greece and was then followed by the placement within this State. The majority concluded that since the adoption had been previously accomplished, the placement was with parents and not in violation of law. The minority wrote that this loophole should not be available and stated (p 126) "[a] trade in human beings was not intended to be permitted, and cannot be condoned, regardless of how circuitous a route the practice is conducted.”
In the instant cases, the adoptions succeeded and did not precede the placements and neither holding in Scopas is helpful to the defendant.
Matter of E.W.C. (89 Misc 2d 64), does not, as contended by the defendant, hold the type of activities attributed to him to be legal. On the contrary, it affirms the view that lawyers who place children with adoptive parents selected by them and are paid "inflated fees” are guilty of criminal activity. The court there wrote (p 76): "Various measures have been addressed to these evils, including criminal sanctions, requiring the registration of all children placed in the State at the first instance and, finally, doing away with all private-placement adoptions (Grove, Independent Adoption, The Case for the Gray Market, 13 Villanova L Rev 116). Subdivision 6 of section 374 of the Social Services Law is of the criminal-sanction type in that it attempts to prohibit the evils of baby selling by making such activity a crime (Social Services Law, § 389, subd 2). Even if, as the natural mother contends, the New York attorney in cooperation with the Florida attorney illegally placed out this child for compensation, the law makes this a criminal act for which criminal sanctions are prescribed.”
The testimony before the Grand Jury could support the conclusion that the placement of the newborns for a fee was the prime purpose of the defendant and that his role was not *301 limited to that of an attorney in an adoption proceeding or as a "friend” of the natural mothers.
In People v Slater (304 NY 896) the court affirmed, without opinion, a judgment of conviction where the defendant argued on appeal that it was error for the Trial Judge to submit to the jury the question as to whether or not she had been acting as an agent for the adopting parents.
The six counts charging violations of sections of the Social Services Law are adequately supported by the evidence presented.
The counts charging grand larceny in the second degree charge in effect that the adoptive parents parted with their moneys in reliance upon a false representation by the defendant that the placement with them was lawful. I previously held in People v Rosenstein (92 Misc 2d 1069) that such a charge could be sustained where the attorney had made the false representations and he had the superior knowledge of the law.
In the instant case, however, the parents referred to in Count 1 were represented by separate counsel who not only handled the adoption proceeding for them, but originally referred them to the defendant as a source for a child. Since the parents were acting on their own legal advice from an attorney of their choosing, it cannot be said that they were relying upon the defendant’s representations, if any, and the evidence presented does not sustain this count.
With respect to Count 3, the male member of the adoptive parents was himself a practicing attorney and reliance upon the representations is not evident from the testimony given. Again, this count must be dismissed.
The male adoptive parent referred to in Count 2 was an accountant who incidentally was a nonpracticing attorney and apparently unfamiliar with the laws governing the described activity. His testimony upon the subject of representation and reliance includes the following:
"Q Did you question him at all at that meeting as to whether or not this procedure was recognized by the law, whether it was legal at all?
"A Well, at that time I told Mr. Michelman that I not only am a C.P.A., but I’m also an attorney, although I’m not a practicing attorney, and that I would — wouldn’t want to get involved in anything that was illegal or dishonest or whatnot.
*302 "Q And what did he respond to that?
"A He said, "Don’t worry. I would never do something like that or get you involved in something like that.”
"Q Was it based on this representation that he wouldn’t do anything outside the law that prompted you to continue seeing Mr. Michelman and to perfect an adoption through him?
"A That’s correct.”
Under these circumstances, the defendant can be found to have had superior knowledge as to the law and to have made false representations with respect thereto upon which the adoptive parents relied in parting with their money. For the reasons indicated in Rosenstein (supra), the charge of grand larceny in the second degree as set forth in Count 1 is supported by the evidence presented.
Accordingly, the motion to dismiss the indictment is granted as to Counts 1 and 3, and otherwise denied.