OPINION OF THE COURT
Kathryn McDonald, J.
The issue presented, apparently one of first impression, is: what court action is appropriate on an adoption petition in which an interstate placement does not comply with the Interstate Compact on the Placement of Children (Social Services Law, § 374-a) (the Compact or the ICPC) but the child, now three years old, has lived all his life in an adoptive home that clearly meets his best interests.
The facts are as follows:
On February 1, 1977 the natural mother, then 19 years old, gave birth to her out-of-wedlock child in California. Two days later a New York attorney (Mr. G) who had arranged for the release of the child to his New York clients (the X’s) flew to California with the prospective adoptive mother. The child was handed to her at the hospital, and was brought to New York that same day. The natural and adoptive parents are not related to one another, nor even acquainted. In fact, the natural mother and adoptive mother never met or communicated in any way. Some background information concerning the adoptive parents’ home and profession was relayed to the natural mother by the attorney, Mr. G.
An adoptive petition was filed in New York County Family Court on April 21, 1977. Over the next 18 months, four different Judges of this court noted that the natural mother’s consent had not been taken before a Judge, but merely notarized by Mr. G, and directed that the natural mother appear in court, either in New York or in California, in order to give a consent that would meet New York’s requirements under section 115-b of the Domestic Relations Law. The natural mother did not give such a consent until April 18, 1979, when she appeared before this court with court-appointed counsel.
Following acceptance of the natural mother’s consent, this court ordered an investigation of the adoptive home, pursuant to section 115-a of the Domestic Relations Law.[1] The report, *187 dated June 25, 1979, described a loving, healthy family life and recommended approval of the adoption. In October, 1979, the case was submitted to this court for final approval. The court noted that several factual discrepancies existed, and that various documents requested months earlier by another Judge then presiding in the adoptions part had not been provided. In order to save time that might be wasted with further exchanges of information by mail, the court scheduled a hearing and directed the X’s and Mr. G to appear, in order to clarify various questions concerning the file. In particular, the court wished to take testimony along the lines suggested by Matter of Anonymous (G.) (89 Misc 2d 514) as to how the New York adoptive parents arranged to obtain a California child from a young woman who appeared to know virtually nothing about them.
At the hearing Mrs. X, whose recollection was quite limited, described as best she could the actual transfer of the child at the hospital, and both parents testified as to how the adoption was arranged through Mr. G, who was a personal friend of theirs and of the natural mother’s family in California. It is clear from their testimony that they knew nothing about the natural mother, other than her family’s friendship with Mr. G, and that they simply assumed Mr. G had informed the mother of their own backgrounds. It also became painfully apparent at that time that the child, now three years old, had developed a severe hearing disability of unknown origin. From the court’s own observation, the child appears to be completely deaf. The X’s devotion to the child is manifest: they have consulted several doctors, regularly drive the child to a treatment center in Pennsylvania, and work with him daily on various exercises designed to help him gain access to the hearing world. On the basis of the best interests of this child, this court would not hesitate to sign an order of adoption.
The attorney was questioned by the court after his clients had been excused. He testified that he had known of the natural mother’s pregnancy and of the X’s desire to adopt a child, and had arranged the adoption at the mutual request of the parties. He also testified that in the previous three years he had served as attorney in "approximately fifteen” private adoptions, of which half involved interstate placements, and that he had received other babies from the same California hospital.
The court inquired why the Interstate Compact had not *188 been complied with, and was advised by counsel that, in his experience, the Compact was not applicable, and was, in fact, impractical in the private adoption context, since the required preplacement investigation of the prospective adoptive home would delay the rapid placement that adoptive parents usually desired. It is clear that no Compact papers have ever been filed in this case, and that the child was placed with persons unrelated to the natural mother. Nevertheless, counsel maintained that the ICPC was not applicable, and stated that "I believe that there is an opinion from a county attorney, maybe one of the surrounding suburbs, that says an interstate compact does not apply to a private adoption.” At the conclusion of the hearing, the court reserved decision and advised counsel that further research on the applicability of the Compact and its effect on the petition was required.
Having received no further communication or legal memorandum from counsel, the court’s law assistant wrote Mr. G on March 17, 1980 requesting copy of the decision referred to at the January hearing. Mr. G provided the court with a nine-line letter, dated July 21, 1972, from the New York State Board of Social Welfare ("BSW”) to one William Lotz, a law assistant in the Nassau Surrogate’s Court, which "is a supplement to our letter of June 30, 1972” (which was not provided to this court). The brief letter states, in sum: "We now have an opinion from our Office of Counsel which reads as follows: There is no statute prohibiting per se, persons from bringing a child into this State for adoption by themselves. Of course, under the provisions of Section 382 of the Social Services Law, they would be financially responsible for the child. We trust this information will be helpful to you.” However helpful that letter may have been to the recipient in 1972, it is of no use to this court. One can only speculate what the question was for which the opinion was provided; one does not know what previous information has been "supplemented.” Counsel stated in his cover letter of April 2, 1980, that the BSW letter "is the basis of this and other Courts [sic] not giving credence to the Inter-State Compact Act [sic] when private adoptions are concerned.” This bare statement, plus the cryptic and incomplete BSW letter, form the sum of counsel’s argument that the Compact need not be satisfied. The only other submission on the question is counsel’s letter of April 16, 1980 in which he cites the natural mother’s irrevocable consent, the adoption investigation conducted by the court’s probation *189 staff, and the "extenuating circumstances” concerning the child’s disability as a basis for urging that a final order of adoption be signed.
THE APPLICABLE LAW
The court has conducted its own research, including review of sections 374 and 374-a of the Social Services Law (the Compact); opinions of the Attorney-General concerning private, interstate placement of children for adoption; and regulations and secretariat opinions of the ICPC Administrator. The threshold question is whether the Compact applies to this fact pattern; if it does, and has not been satisfied, the question is what action on the adoption petition is appropriate at this time.
The Compact, adopted by New York in 1960, is not only New York law but an interstate contract, and as such it must be upheld by the courts of the contracting States. (Secretariat Opn No. 16, May 16, 1975.) Violations of the Compact constitute violations of the laws of both contracting States. (Compact, art IV.) The court’s sworn duty to uphold the law is owed not only to the parties before it, but to the contracting States as well. The court is mindful of that obligation, and of the potential conflicts between its duty as a representative of the State’s parens patriae concern for this child’s welfare and for the enforcement of laws that might not, at this stage, have a beneficial effect on the child. Stating the problem bluntly, there may be difficulty reconciling the best interests of a three-year-old child with the State’s interest in enforcing its legal procedures and contracts.
Article III of the Compact (Conditions For Placement) states that a child shall not be "placed” interstate unless all requirements of the Compact have been met. These requirements include investigation of the prospective adoptive home before the child is moved, thus allowing the receiving and sending States to evaluate the suitability of the placement, and possibly supervising it during the period before the adoption is final. Penalties for transferring any child interstate without compliance with the Compact are set in article IV, and include sanctions in both the sending and receiving States, and loss of license or other authorization to place children.
Of central consideration is article VIII of the Compact entitled Limitations, which exempts certain family members (parents and close blood relatives) and guardians from compli *190 anee with the Compact. Article VIII reads: "This compact shall not apply to: (a) The sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state.” Thus it is clear that even if it is the parent who sends the child to another State, unless it is a parent or enumerated relative or "non-agency guardian” who receives the child, the Compact applies. In this case, it is not at all clear that it was the natural mother (and not Mr. G) who "placed” the child with the New York adoptive parents, but assuming, for the moment, that it was indeed the natural mother who made the placement, the fact remains that the X’s, as unrelated, unacquainted strangers, did not qualify for exemption from the Compact under article VIII.
The term "non-agency guardian” is not defined in article II (Definitions). However, regulation III, adopted by the Association of Administrators of the Interstate Compact on April 19, 1978, states in paragraph (c): "Article VIII(a) of this Compact applies only to the sending or bringing of a child into a receiving state to a parent or other specified individual by a parent or other speciñed individual whose full legal right to plan for the child has been established by law at a time prior to initiation of the placement arrangement, and has not been voluntarily terminated, or diminished or severed by the action or order of any Court.” (Emphasis added.) Mindful that the Compact as a whole is to be construed liberally (art X) in order to effect its purposes (art I) the court concludes that a nonagency guardian who receives the child must meet the same standards as one who places the child, and for the same reasons: so that only one whose legal relationship towards the child has been independently and legitimately established will have the right to effect such a drastic change as an interstate placement without the oversight and supervision of the contracting States.
It might be argued that the transfer of the child in California does not require compliance with the Compact because it was not, technically, an interstate transaction, since the natural and adoptive mothers were both present in California at the time the transfer was made. Such an argument would be rejected on the basis of Secretariat Opinion No. 2 (Oct. 25, 1972): "If the transaction can be proven fraudulent in that its mechanics were arranged specifically for the purpose of evad *191 ing limitations otherwise applicable to the interstate transportation of children for purposes of foster care or adoption, the Compact would apply. The limitation of Art. VIII(a) of the Compact would not apply (since the recipient individual was not a close relative.) Moreover, it could be successfully contended that the transaction must be viewed as a whole and that the child was in fact the subject of an interstate placement.”
The court therefore concludes that the Compact does apply to this case. Counsel concedes that the proper papers were never filed, which failure is itself a violation of the Compact. (Art III.) However, there may be another, more serious violation arising out of the placement arrangement.
The circumstances of this placement remain contradictory and unclear, but the court seriously doubts that the natural mother herself "placed” her child with the X’s, whom she had never met and about whom she knew very little.[2] By her own testimony in April, 1979 and according to her affidavit of February 3, 1977, the natural mother released her two-day-old baby not to the adoptive parents but to their attorney, Mr. G. The facts of this case are strikingly similar to those described in the opinion of the Attorney-General dated January 9, 1975 (1975 Opns Atty Gen 26), in which the Attorney-General concluded that a New York attorney who arranges for surrender to him of children born to unwed mothers in California, has the infants delivered to New York couples who visit California to receive the children, and who, after the couples, the child and the attorney return to New York, initiates adoption proceedings here, has violated subdivision 2 of section 374 and subdivision 2 of section 382 of the Social Services Law, which prohibit any but an "authorized agency” from placing children for adoption.
Further, if the placing by the attorney is illegal in the receiving State, it is illegal under the Compact. (See art III and interpretive commentary, art III, par [a].) Had compliance with the Compact been attempted, Secretariat Opinion No. 38 *192 (April 7, 1977) recommends that Compact approval and cooperation should have been denied:
"Finally, it is asked whether a receiving state in which independent placements are unlawful should refuse to approve an independent placement sought to be made [emphasis added] pursuant to the Compact and whether it should also refuse to do a home study. The answer is in the affirmative on both counts.
"Article III of the Compact specifically provides that placements must be in conformity with the laws of the receiving state. Consequently, a valid placement cannot be made by an independent placer into a state where such placements are prohibited by law.
"If the placement cannot lawfully be made, there is no reason for the receiving state to do so or facilitate a home study. The only purpose of such a study is to assist in ascertaining whether the proposed placement should be made. Since the answer is already known to be in the negative because the placement would be unlawful, no useful purpose would be served by the study. In fact, it might be an aid to the violation of law. If the home study were done and showed that the home was a feasible one, this might encourage the parties to violate the law and make the placement.”
That opinion notes as well that early attention to compliance is the only effective means of enforcing the Compact, because "unless the Compact and the laws of each party jurisdiction are respected, the entire system can break down and the only function of the courts and public agencies becomes to ratify what has already been done. Such a course was not intended by the legislatures and would not be good practice.”
This court, confronted with an adoption petition dating from 1977, does not have the luxury of preventing a placement before it was made. By evading the Compact altogether, the parties neither received nor needed any encouragement to make the placement as they did. However, this court is not in a position to investigate further the placement arrangements made more than three years ago. It must, however, rule on the adoption petition before it.
It is recognized that the court, reviewing the adoption petition some time after the transfer has taken place, may be the first public agency to learn that a placement has occurred outside the Compact. (Secretariat Opn No. 38, supra.) At that *193 stage, and depending on how long a period has elapsed, the court’s obligation to enforce the laws of the State and the Compact becomes complicated by the fact that the child’s life has already been established with the prospective adoptive parents. Secretariat Opinion No. 16 (May 16, 1975) notes that: "Unfortunately, it often happens, through inadvertence or otherwise, that children are placed from one Compact state into another without observing Compact procedures. Obviously, such actions are unlawful and every effort should be made to prevent them. However, when they do occur the most desirable course to follow is often dependent upon reasonable judgment as to the equities.”
This court has attempted to weigh all factors, with particular emphasis on the rights of the child, the one person whose motives and actions cannot be questioned, who is completely blameless, and whose helplessness commands the special protection of the court. In viewing a similar factual dilemma, Secretariat Opinion No. 37 (April 7, 1977) states: "The most intractable aspect of the problem is the unlawful surrender of the child to an individual who was not a proper legal recipient and who could not * * * make a placement. Unless this wrongful occurrence is undone or otherwise cured, the child cannot be legally free for adoption. It is true that the courts * * * might be kept in ignorance of this circumstance or that they might choose to overlook it. But the effect of such action would be to consummate an adoption apparently valid but actually open to attack. The vulnerability may never be uncovered or it could arise at any subsequent time through the vehicle of a contested inheritance, a custody suit, or in some other manner.”
The paramount obligation of this court is to fulfill its parens patriae role to protect the best interests of this child. His interests will be served only by an adoption order that is completely secure and not vulnerable to attack. After a painstaking review of the entire file, including repeated scrutiny at different stages of this proceeding this court concludes that a final order of adoption can be issued with full confidence in its integrity. The essential requirements of a sound adoption have been met:
(1) the natural mother has given her irrevocable consent before the court, pursuant to section 115-b of the Domestic Relations Law after consulting with independent, court-op-pointed counsel;
*194 (2) the adoptive parents have agreed to adopt the child, and have been found to be exemplary parents. (In fact, the parents were investigated twice, in 1977 and in 1979, and both reports contain firm recommendations that the adoption be approved);
(3) all the documents required in article 7 of the Domestic Relations Law have been provided.
The court concludes, therefore, that only the failure to comply with the Compact and the possible violation of section 374 of the Social Services Law by Mr. G stand in the way of a final order of adoption.
Although neither California nor New York had an opportunity to evaluate the planned interstate placement before it took place, as the Compact clearly intends (art I) it is clear to this court that the ultimate goal, a placement that affords the child a "suitable environment” in a secure, loving home has been achieved, albeit fortuitously. Had preplacement investigations of the prospective adoptive home been conducted in 1977, the court is confident that the X’s would have received the same glowing endorsements this court’s probation worker eventually provided.
Whether the two States’ investigators could have predicted the tragic disability that overtook the otherwise healthy child is a question that cannot now be answered. Had this child been surrendered to an agency, more complete medical information doubtless would have been available to the adoptive parents, and the placement made with the child’s particular needs in mind. As it happened, the X’s — well educated, prosperous, and above all, loving and devoted parents — have provided the child (who has become, for all but legal purposes, their son) with a fine home. Their devotion to him is beyond question, and appears to have been only strengthened by their discovery of his handicap. The court is wholly convinced that it is in this child’s best interests to remain with these parents and, further, that the poorly planned or technically unlawful placement arrangement need not prevent issuance of a final order of adoption. See Matter of E.W.C. (89 Misc 2d 64, 76) in which Judge Bennett concluded that even if an attorney acted illegally in placing out a child for adoption, "this court is of the opinion that the adoption itself should not be refused because of a possible violation of a law which calls for a criminal sanction.”[3] The court shares that view, particularly *195 in light of the fact that in this case, in contrast to E.W.C. (supra), the natural mother has not contested the adoption, but appeared in person before the court and executed a statutorily correct and irrevocable consent. This adoption is legally secure.
The Family Court, although required to enforce the laws of the State, is neither an investigative nor prosecutorial body, and therefore this court defers to other, more appropriate agencies to investigate possible wrongdoing that is beyond the jurisdiction of this forum.
This court will sign the final order of adoption at a hearing to be held at 9:00 a.m. on Wednesday, May 21, 1980. It will also release a copy of this decision to the New York State Compact Administrator, for such action as he deems appropriate.

. The putative father of the child has never been named in any manner, and his consent is therefore impossible to obtain and not required.

. The transcripts of April 18, 1979 and January 9, 1980 and the various affidavits by the natural mother, the adoptive parents, and Mr. G contain numerous inconsistencies regarding such matters as the natural mother’s age at the time she gave birth (actually 19, but according to Mr. G some four or five years younger), the extent of background information exchanged, the time at which the arrangements for the placement were made (in her last month of pregnancy, according to the natural mother; much earlier according to Mr. G) and Mr. G’s prior involvement with the natural mother’s family (particularly with reference to earlier adoptions).

. The court notes that the statutory sanctions appear to be somewhat limited, at *195 least insofar as one who does not have a license to place children in the first place cannot be deprived of it, as provided in article IV of the Compact.