*950 OPINION OF THE COURT
Claire T. Pearce, J.
Petitioners seek to adopt an infant brought into the State of New York in violation of the provisions of Social Services Law § 374-a (Interstate Compact on the Placement of Children, hereinafter I.C.P.C.). The petition is dismissed without prejudice for the reasons stated below and the child is hereby designated a ward of the Commissioner of Social Services (CSS) pursuant to Social Services Law §§ 62, 395, 398 and the Compact Administrator is directed to investigate and take the appropriate action under the I.C.P.C. The court further directs that no subsequent petition or application for adoption by the instant parties be filed in any court of competent jurisdiction unless and until the Compact Administrator grants approval in accordance with his statutory responsibility or an "authorized agency” presents the petition under Domestic Relations Law § 112; and that the CSS continue the subject child "placed out” (Social Services Law § 371 [12]) with the petitioners in his current "family free home” (18 NYCRR 441.2 [j]), unless his protection, supervision or best interest requires otherwise.
FACTS
The subject child was born on January 12, 1986 in San Jose, California, and was transported to New York State on or about March 4, 1986 by an unrelated person, whose identity has been variously given at this proceeding as the prospective adoptive father’s (hereinafter P.A.F.) "aunt” or "cousin”, or "sister” named "Bok Cha Shim” (phonetic spelling) or "Choi Kung Jon” (phonetic spelling). The P.A.F. testified at a hearing held on June 13, 1988 that the first name of his "aunt” was known to his wife — he could not state what the full name was and the prospective adoptive mother (hereinafter P.A.M.) stated that her husband’s "aunt” was known as "Bok Cha Shim”. Both parties then agreed that this "aunt” was known by two names due to her evidently recent marriage. No explanation was given for the total lack of similarity as to any part of this individual’s two names.
The petitioners arranged for the "aunt” to transport the child from California to New York and claim to have paid $350 for the fare. The parties had no prior knowledge of the natural parents and indicate only telephone contact with the *951 mother which was apparently, but not unequivocally, subsequent to the child’s birth.
The P.A.M. testified that she and her husband had long wished for a child and "did not wish to wait”. Although their interest in adopting had not been communicated to the "aunt” to their knowledge, they were called by her when the child’s natural mother presented herself and her situation to the "aunt”.
The natural parents appeared in Superior Court in Santa Clara, California, and acknowledged surrender of the child on June 2, 1986, approximately three months after the child had been removed from the State. No evidence is adduced of the natural parents having been advised pursuant to Domestic Relations Law § 115-b (2), even as it pertained prior to the September 1, 1986 amendments.
The presence of the child in this State in violation of the Interstate Compact was not communicated to the Administrator prior to the institution of this proceeding by the P.A.F., P.A.M., or their attorney. Following the suggestion of the court the petitioners contacted the Compact Administrator and the attorney for petitioners states that the Administrator declined to entertain an application for retroactive approval under the I.C.P.C.
Despite the court’s direction on February 11, 1988 of a full hearing into the facts and circumstances surrounding the infant’s removal from California as outlined in Matter of Baby E. (104 Misc 2d 185), the petitioners failed to exercise diligent efforts to locate the natural parents or to seek to assure or compel their appearance or that of other material witnesses to the events concerning the child’s status in California and his removal and transportation to New York.
THE LAW
The I.C.P.C. states the requirement for approval by the New York State Compact Administrator for the transportation of a child into this State from a signatory State (all States except New Jersey are signatories) for the purpose of "placement” as defined under article II (d). (See also, Social Services Law § 371 [12]; NY State Dept of Social Servs Admin Directive 85 ADM 22.)
Social Services Law § 382 (2) (a) also provides that "It shall be unlawful for any person * * * to bring, send or cause to be brought or sent into the state of New York any child for the *952 purpose of placing or boarding such child or procuring the placing of such child, by adoption, guardianship, or otherwise, in a family, a home or institution, except with an authorized agency, in this state, without first obtaining a license from the department.”
Certain persons set out under I.C.P.C. article VIII (a) are exempted from the provisions of the Compact. Such exemption is inapplicable to the facts of this case.
Article IV of the I.C.P.C. provides for "penalty for illegal placement” including criminal sanctions for violations of the Compact. (See, Matter of Anonymous [G.], 89 Misc 2d 514; Matter of Aronson, 18 AD2d 53; People v Michelman, 93 Misc 2d 297.) However, criminal sanctions may not be appropriate or applicable in every case and the language of the Compact is precatory leaving to the discretion of the signatory State in each instance the decision to institute criminal proceedings. The language of the article is phrased so as to allow for other more appropriate sanctions to be administered by its signatories to enable and encourage strict enforcement of the important underlying purpose and public policy goals enumerated in article I.
Contrary to the explicit provisions of the "interpretive” memorandum and opinion of the Secretariat of the Association of Interstate Compact Administrators, "Enforcement of the Interstate Compacts on Placement of Children” (Apr. 1981, at ii, iii, iv, 1-6), by which the New York State Compact Administrator is bound (see, 85 ADM 22, at 12), the New York State Compact Administrator has refused to investigate, review, evaluate, or approve illegal placements retroactively (see, Dept of Social Servs form letter No. 3874 [Nov. 1987]). This failure of the Compact Administrator is contrary to the letter and spirit of the I.C.P.C. and gravely undermines the effective detection and prompt rectifying of placements which violate the Compact, consequently leaving a significant number of children in limbo and at possible risk. The Secretariat points out in its memorandum (op. cit, at 1-6, iii), "An unlawful placement should be rectified or terminated immediately [emphasis in the original]. Those who have perpetrated or participated in an unlawful placement should not be allowed to benefit from it. Consequently, unless the placement can be converted to a legal one and this is done, the child should be removed from the placement and returned to the sending party in accordance with the compact. * * * [Enforcement actions should serve (1) to rectify violation through *953 retroactive compliance (2) to enforce sending agency obligations in already approved placements and (3) to decrease the probability that violations will occur in the future. ” (Emphasis supplied.)
New York State courts, in instances where they are faced with children who have been brought into the State in violation of the I.C.P.C. (usually as here in adoption proceedings initiated several months or years after the fact) have in a growing line of cases ignored those violations and granted the adoptions on a theory of invoking the doctrine of parens patriae to protect "the best interests of the child”. (Matter of Female S., 111 Misc 2d 313; Matter of Baby E., 104 Misc 2d 185, supra; Matter of Juan P. H. C., 130 Misc 2d 387; Matter of Tersigni [Carballo], 137 Misc 2d 553; cf., Matter of Unnamed Baby Boy, 110 AD2d 1019.) However, the rationale of a "best interest” determination in the context of such a proceeding without a prior determination by the Compact Administrator has been strongly questioned by the Secretariat (see, Judicial Responsibilities: The Interstate Compact on the Placement of Children, Adoption and "The Best Interests of the Child”, Apr. 1988).
The Secretariat challenges the authority and ability of the court to make a "best interest” decision in the first instance and prior to administrative review and determination based upon: (1) the Federal constitutional prohibition against impairment of contracts (the I.C.P.C.) between or among the States (US Const, art I, § 10, cl [1]; Green v Biddle, 8 Wheat [21 US] 1); (2) the resultant undermining of I.C.P.C.’s enunciation of public policy and child protection objectives which are intended to foster "prudent child welfare practices” in the interests of "children in general” in addition to the interest of a particular child; (3) the delegation of authority to the Compact Administrator to determine who, among all the available adopters, is most appropriate to adopt an individual child brought to this State by a stranger, and the court’s general lack of information, mechanisms, personnel and expertise to initially determine that question. (See also, Matter of Anonymous, 46 Misc 2d 928.)
In addition to the basis outlined by the Secretariat, it is to be noted that the I.C.P.C. article III (a), (b) (conditions for placement) in effect establishes conditions precedent to a subject child’s lawful establishment of residence in a signatory State by requiring compliance with each and every requirement of article III "Prior to * * * placement in foster care or *954 as a preliminary to a possible adoption”. Noncompliance is determined in the sole discretion of the Administrator of the receiving State and return of the child to the State of origin is mandated unless approval of the Administrator is granted. This calls into question the court’s jurisdiction over the child prior to administrative approval of residence in the State. (Finlay v Finlay, 240 NY 429.)
CONCLUSION
The doctrine of parens patriae is prematurely and unnecessarily exercised by the court where the CSS and his agent, the Compact Administrator, have been statutorily designated to act in the best interest of infants brought into the State who come within the provisions of the I.C.P.C.
The courts’ exercise of authority in these instances has most consistently resulted from a determination to view the child’s present situation as a "fait accompli” and to equate that with "best interests”. (Matter of Baby E., 104 Misc 2d 185, supra; Secretariat mem, op. cit.)
Concomitantly the executive role of the State as guardian and parens patriae, which also encompasses its responsibility to protect all dependent infants and incompetents under its general police powers and duty to provide for the general welfare (see, NY Const, art XVII, § 1; Social Services Law § 395; Ginsberg v New York, 390 US 629; Matter of Female S., 111 Misc 2d 313, supra) is ignored by recent decisions.
A determination to deny an adoption of a subject child presently to await appropriate investigation and administrative action has not been shown to be deleterious to any individual child, including this one, and there is ample basis for determining that such a process will accrue to further ensure the health and safety of the subject child and the myriad other children surreptitiously brought into the State in violation of the I.C.P.C. (See, Secretariat mem, Apr. 1, 1988, op. cit.) (It is also noted that most "dependent children” [see, Social Services Law § 371 (7)] born within this State are the subjects of a series of administrative determinations of best interest prior to judicial action on the road to final adoption [see, Domestic Relations Law § 112].)
Therefore this court declines to invoke the court’s authority under parens patriae finding it neither required by a showing of exigent or emergent circumstances to protect the child, nor shown to be in the child’s best interest; and further finds that *955 the I.C.P.C. specifies conditions precedent to the establishment of residence by the child and that jurisdiction over the child by the court is therefore not established; that the court lacks authority to abrogate contracts between and among the States; and that the general welfare of children illegally transported over State lines will be promoted by strict enforcement of the I.C.P.C. and the discouragement of its evasion.