396 S.E.2d 475

**STATE OF FLORIDA, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES ex rel. STATE OF WEST VIRGINIA, DEPARTMENT OF HUMAN SERVICES, DIVISION OF SOCIAL SERVICES,**

v.

**Carl THORNTON and Mildred Thornton and Honorable Clarence L. Watt.**

**No. 19412.**

Supreme Court of Appeals of West Virginia.

July 27, 1990.

Anthony N. DeLuccia, Jr., Dist. Legal Counsel, Fort Myers, Fla., for State of Fla.

Roger W. Tompkins, Atty. Gen., Richard M. Riffe, Sr. Asst. Atty. Gen., Atty. Gener-

---

**3.** The defendant also asserts certain instructional errors, but after a careful review, we find them to be without merit.

**514**

al's Office, Charleston, for Clarence L. Watt.

Harvey D. Peyton, Calwell, McCormick & Peyton, Nitro, for Carl & Mildred Thornton.

PER CURIAM:

The petitioner, the State of Florida, Department of Health and Rehabilitative Services (HRS), seeks a writ of mandamus both to compel compliance with a prior order of this Court and to advise the Honorable Judge Clarence L. Watt that any assumption of jurisdiction in this case is punishable by contempt in view of the prior order. The petitioner also requests that this Court issue a writ of habeas corpus directing the respondents, Carl and Mildred Thornton, to deliver the infant child, C.H., to the appropriate representative of the HRS for placement.

This case involves the custody of C.H., who was born on August 26, 1985, to Catherine Sue Freeze and Roy C. Harris, Jr. Although the parents of C.H. chose not to marry, Mr. Harris acknowledges paternity. Ms. Freeze moved with C.H. to Florida shortly after the child's birth. She is currently serving a term of life imprisonment in Florida on a conviction of murdering C.H.'s older brother.[1]

C.H. was found to be a dependent child by the Twentieth Judicial Circuit in Lee County, Florida, on March 3, 1986, and accordingly placed under the legal custody of the State of Florida.[2] On July 8, 1986, Florida granted physical custody of C.H. to the Thorntons. Mrs. Thornton is an aunt to C.H.'s mother. The HRS retained supervision of this custody arrangement pursuant to the provisions of the Interstate Compact on Placement of Children (ICPC or Compact).[3] The custody transfer occurred when C.H. was just eleven months old. According to the Thorntons' testimony,[4] C.H. was delivered to them at the Kanawha County, West Virginia, airport by an HRS social worker. The exchange between the HRS representative and the Thorntons was quite brief, and no meaningful instruction on the child's care was supplied to his new guardians. C.H. was given to the Thorntons with little clothing, a few old toys, and no diapers.

Financial support for the care of C.H. was provided to the Thorntons by the West Virginia Department of Human Services (DHS). Without explanation, DHS terminated all benefits to the Thorntons for the care of C.H. in April 1988. Since that time, the Thorntons have provided C.H.'s total support without any state assistance.[5]

On August 28, 1986, Florida petitioned to have physical custody of the child removed from the Thorntons. Florida gave the following reasons for the requested return of C.H.:

(1) the placement of the child had proved unsuccessful and that the West Virginia Department of Human Services had requested the child be removed from the home; (2) the Thorntons withheld vital information from the Department of Human Services that would have affected their decision on placement [6]; and (3) the

---

1. There is no clear indication in the record as to whether the natural mother's or natural father's rights were ever severed.

2. Counsel for the Thorntons informed the court at the November 13, 1989 hearing this order had been entered without notice to the natural father. The record provides no additional information on this point.

3. *See* W.Va. §§ 49–2A–1 to –2 (1986) and Fla. Stat.Ann. §§ 409.401 to 409.405 (West 1986) for the respective state codifications of the ICPC.

4. This testimony was taken by the Circuit Court of Putnam County on November 13, 1989.

5. This is according to the testimony of Mildred Thornton taken at the hearing held before Judge Watt on November 13, 1989.

6. This "withheld information" was first identified by the HRS at the oral argument on this case held before this Court on January 10, 1990. The information involved the health of Mildred Thornton. When asked about her health on one occasion by a DHS employee, she allegedly replied that she was healthy, with no medical problems. At a subsequent visit from the same DHS representative, Mrs. Thornton allegedly stated that the Thorntons' financial posture had improved because she was receiving social security benefits for her nervous condition. At the November 13, 1989 hearing, though, Mrs. Thornton had testified that she was unaware of

Thorntons were financially unable to provide for the needs of the child.[7]

The Twentieth Judicial Circuit in Florida granted a motion for a custody change of C.H. on March 4, 1987. There is no indication in the record whether the Thorntons or the natural father received any notice of this hearing or any opportunity to participate. Based on information from West Virginia DHS that the child should be removed from the Thorntons' care, legal custody was placed with an aunt and uncle from Ohio, Anthony and Sharon Barberino.

When the Thorntons failed to surrender C.H. pursuant to a Florida court order, the State of Florida filed a petition for a writ of habeas corpus in Putnam County, West Virginia. Florida HRS sought to compel the delivery of C.H. to them through this writ. The West Virginia circuit court granted the writ, but stayed the proceeding pending this Court's resolution of certain certified questions.

We answered the following certified question through entry of an order in *Florida ex rel. Dep't of Human Serv., Div. of Social Serv. v. Thornton*, No. 87–C–86 (Putnam Co. Cir.Ct. July 20, 1989):

1. Upon a petition for a writ of habeas corpus seeking the return of a child from persons in the receiving state pursuant to the provisions of the Interstate Compact on the Placement of Dependent Children, does the Court in the receiving state in which the Petition is filed have jurisdiction to hear evidence regarding the validity of the underlying placement order vesting custody of the infant child in the appropriate agency of the sending state?

Interpreting the ICPC, we determined that the West Virginia circuit court was without jurisdiction to hear evidence regarding the underlying placement order governing C.H. *Id.* at 5. We further ordered the Putnam County Circuit Court to proceed with the granting of the writ of habeas corpus which had been stayed to permit resolution of the certified questions.[8] *Id.*

A hearing was held before the Honorable Judge Clarence L. Watt on November 13, 1989, for the purpose of enforcing this Court's July 20, 1989 order pertaining to the certified question. Counsel representing both the DHS and the HRS were present, along with the Thorntons and their counsel. Counsel for the HRS and DHS instructed Judge Watt that the only action which he could take was to enforce the habeas corpus writ previously granted by this Court. Both HRS and DHS took the stance that Judge Watt was without jurisdiction to take any evidence at that time regarding the placement or custody of C.H.

The Thorntons argued that Judge Watt should take evidence at that time concerning their allegation that the State of Florida had breached the ICPC. The Thorntons contended that the State of Florida breached the compact by failing to provide financial support for C.H.[9] Based on this financial abandonment, the Thorntons maintained that Florida was deprived of its jurisdiction and accordingly, the Putnam County Circuit Court had a "duty to protect the best interest[s] of [C.H.]...." The Thorntons further suggested that the court, pursuant to the written relinquishment of the natural father's rights, should permit them to adopt C.H.[10] In response to

what vital information she had allegedly withheld from DHS. Her testimony at this hearing did not reveal any misgivings or doubts as to her and her husband's ability to provide for C.H., nor was there anything to indicate that she was in any way unstable or disabled to care for the child.

7. *Florida, ex rel. West Virginia Dep't of Human Serv., Div. of Social Serv. v. Thornton*, No. 87–C–86 (Putnam Co. Cir.Ct. November 21, 1989).

8. Although three certified questions were presented to this Court, we did not address the remaining two questions based on our belief at

that time that the remaining two questions were mooted by our resolution of the first question.

9. Article V. of the ICPC provides, in pertinent part: "The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." W.Va.Code § 49–2A–1, art. V(a).

10. The Thorntons have held throughout the entire proceeding that they received a written consent to adoption from C.H.'s natural father on May 14, 1987.

this argument, HRS maintained that the adoption issue had to be resolved through the Florida court system, because the child was technically still a ward of the State of Florida.[11]

Despite the strenuous objection of the HRS and DHS, Judge Watt heard testimony from several witnesses regarding the custodial situation of C.H. since his arrival in West Virginia in July 1986. Mildred Thornton testified that they had never received financial support for C.H. from the State of Florida, but that West Virginia did provide support until April 1988. Mrs. Thornton said the explanation she received from West Virginia DHS was that services were cut off because C.H. was a blood relative. She further informed the court that in the three years C.H. had lived in their home, the DHS had visited the home less than five times; had never made a phone call to check on the child; and had made no inquiry of any kind concerning the child since benefits were cut off in April 1988. The testimony of Carl Thornton corroborated his wife's testimony.

The Thorntons' adult daughter, Melissa Snyder, testified favorably concerning her parents' fitness to take care of C.H. The Thornton's minister, Rev. Arnie Persinger, agreed with Mrs. Snyder's testimony that the Thorntons were fit and proper people to care for C.H. Danny Corey, the guardian ad litem appointed to represent C.H., testified regarding the living conditions and care C.H. was afforded in the Thorntons' household. Mr. Corey found the Thorntons' home to be quite satisfactory and nurturing for a small child, and found no evidence that C.H. received insufficient care in his great aunt and uncle's home. Both Mr. Corey and Reverend Persinger expressed grave concern as to whether a change in C.H.'s custodial parents would be in his best interest. Mr. Corey testified that taking C.H. out of the Thorntons' home "would be catastrophic" to him. Re-

verend Persinger testified that he did not believe anyone could give him better care than the Thorntons and that removing C.H. from their home "would just tear him apart." C.H. testified himself, and informed the court through questions from Mr. Corey, that he was quite happy in the Thorntons' home.

At the conclusion of the November 13, 1989 hearing, the Thorntons' counsel made a motion to have C.H. examined by a duly-qualified expert to determine what effect a custodial change would have on the child. Judge Watt took this motion under advisement, and informed the parties that C.H. was to remain in the Thorntons' custody for the time being.

On November 21, 1989, the Florida HRS filed a petition seeking the writ of mandamus which is before the Court at this time. Through this petition, HRS seeks a directive from this Court advising Judge Watt that assumption of jurisdiction will be punishable by contempt and a writ of habeas corpus directing the Thorntons to relinquish physical custody of C.H.

The case before us appears to be a classic example of the bureaucracy run amuck. The record from the November 13, 1989 hearing reflects that both the Florida HRS and the West Virginia DHS effectively abandoned C.H. According to Mrs. Thornton's testimony, Florida HRS has never had any contact with her or her family regarding C.H. and the West Virginia DHS has made less than five visits, no home study, and no phone calls since C.H. came to live with her family in the spring of 1986. The evidence presented at the hearing before Judge Watt suggests that both the HRS and the DHS failed to meet their continuing responsibility to monitor and supervise the placement of C.H. with the Thorntons. Incredibly, even though C.H. had been with the Thorntons for more than three years at the time of the hearing, neither agency indicated the least bit of interest in how the

---

11. The fact that the Thorntons had filed a petition to adopt C.H. in the Putnam County Circuit Court was alluded to at the hearing on November 13, 1989, by both the Thorntons' counsel and the attorney representing HRS. Judge Watt also gave mention to this petition to adopt in his

July 20, 1989 order. However, the present record does not provide us with any specific information which may be contained in such petition, or the date this petition was allegedly filed.

child was doing. Either agency could have requested a home study, a psychological evaluation, or an inquiry into the child's emotional and physical adjustment. As one commentator has noted, "[t]he ICPC was intended to extend the jurisdictional reach of a party state for the purpose of investigating a proposed placement *and supervising a placement once it has been made.*" Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption* 68 Neb.L.Rev. 292, 296 (1989) (footnote omitted and emphasis supplied). Given the additional fact that neither agency investigated the child's status or in any way supervised his placement, we cannot view this apparent abrogation of supervisory responsibility lightly. Given the additional fact that neither agency has indicated the slightest interest in making inquiry into the child's present status, we must wonder if the bureaucrats have lost sight of their real mission, that of ensuring that any decision regarding the child is in his best interest.

In arriving at a decision in this case, we begin by acknowledging the fact that this state is a signatory to the Interstate Compact on the Placement of Children.[12] We thus find it important to convey a workable understanding of the purposes of the ICPC and the confines by which this Compact shapes our decision today. The ICPC sets forth the circumstances under which any participating state may place children out of state. The provisions of the compact are typically relied upon to effect placement of children in foster homes or in the homes of prospective adoptive parents. *See* Hartfield, *supra* at 295. Although we do not dispute the applicability of the ICPC to this case, we do question, however, whether Florida retains jurisdiction over C.H. given the allegation placed on the record by Mrs. Thornton at the November

13, 1989 hearing that all financial assistance was terminated in April 1988.

The ICPC is clear, in the article entitled "Retention of Jurisdiction," that "[t]he sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." W.Va.Code § 49–2A–1, art. V(a). The ICPC is equally clear that "compl[iance] with each and every requirement set forth in this article [article III.] . . ." is required to invoke the provisions of the Compact. *Id.* at art. III(a).

At least one court has determined that a sending state's failure to comply with the Compact results in a termination of the state's jurisdiction over the placed child. In the case of *Templeton v. Witham,* 595 F.Supp. 770 (S.D.Cal.1984), *order vacated on other grounds,* 805 F.2d 1039 (9th Cir. 1986)[13] the United States District Court reached an equitable result for the child, despite the fact that a strict reading of the ICPC seemed to convey that the sending state retained jurisdiction over the child. The court stated in that case that although

> [t]he ICPC does not expressly state that failure to follow its procedures for interstate placement will result in a loss of jurisdiction over the child, . . . this conclusion nonetheless follows for several reasons. First, the Compact makes it perfectly clear that the requirements of prior notice to the receiving state and approval therefrom are mandatory. Second, the statute declares that circumvention of those requirements constitutes a violation of both California [sending state] and Oregon [receiving state] law, and is a sufficient reason to revoke the legal authority of the sending agency, . . .

> Third, a conclusion that a failure to comply with the ICPC results in a failure of jurisdiction makes sense in light of the policies underlying the statute. The

---

**12.** Both West Virginia and Florida are signatories to the Compact which every state but New Jersey has to date adopted. *See* Hartfield, supra at 295.

**13.** Even though an order vacating this case was entered by the Ninth Circuit Court of Appeals in 805 F.2d 1039 (9th Cir.1986), it appears that this

was based on procedural grounds, and not due to unfounded insight regarding the ICPC. Since the United States District Court's insight regarding the ICPC in the *Templeton* case is instructive in the case before us, we elect to discuss this case for such insightful value.

Compact allows a state to place children beyond its boundaries and continue to assert jurisdiction over them so long as the state cooperates in an orderly fashion with the foreign state. Its procedures are necessary to ensure that the receiving state assumes supervision of the child and those caring for her and that the sending state remains apprised of the child's progress and condition *so as to ensure that any decisions regarding the child operate in her [or his] best interests.*

*Id.* at 774–75 (emphasis supplied).

In *Templeton,* the court ruled that the sending state's (California) failure to exercise jurisdiction consistent with the ICPC and the Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A, caused the sending state's jurisdiction to lapse. *Id.* at 776. The infant in *Templeton* had been initially placed with the child's maternal aunt in Oregon and resided there for more than two years when the sending state sought to bring the child back to California with the goal of eventually reuniting her with her mother. *See id.* at 771. The maternal aunt challenged California's jurisdiction over the child and a federal action was ultimately initiated to resolve issues under the PKPA as well as the ICPC. In determining that California had violated the provisions of the ICPC which would have entitled it to continuing jurisdiction over the child,[14] the *Templeton* court found determinative the following facts: (1) No notice was given to the Oregon authorities regarding the 1979 placement; (2) The Oregon authorities did not receive any paperwork concerning the child until almost two years after the placement had occurred; and (3) The California court "operated in a vacuum" as it had no contact with the child following the Oregon

placement, " 'no knowledge of Debra's development and her relationship with others in the [aunt's] home,' " and " 'very little information on Mr. and Mrs. Witham [maternal aunt and her husband] and their own children.' " 595 F.Supp. at 773–74.

In another case which we find instructive on the issues currently before this Court, a New York Family Court recognized that notwithstanding any issues of compliance with the ICPC, "[t]he paramount obligation of this court is to fulfill its *parens patriae* role to protect the best interests of this child." *Matter of Adoption of Baby "E.",* 104 Misc.2d 185, 427 N.Y.S.2d 705, 711 (1980), *superseded by statute as stated in Matter of Baby Boy, O.G.,* 145 Misc.2d 746, 547 N.Y.S.2d 806 (1989). Faced with rejecting an adoption petition based on prior noncompliance with the provisions of the ICPC concurrent with the child's placement,[15] the court recognized that its *parens patriae* duty to protect the child's best interests superseded any question of Compact compliance. Confident that the "ultimate goal, a placement that affords the child a 'suitable environment' in a secure, loving home has been achieved, albeit fortuitously," the court refused to permit noncompliance with ICPC provisions to stand in the way of the adoption. *Matter of Baby "E",* 427 N.Y.S.2d at 711.

We thus find ourselves in a situation somewhat analogous to that in which the court found itself in *Baby "E.".* It appears that a violation of the ICPC may have occurred when financial assistance for C.H. was terminated in April 1988. If this allegation is true, we would be forced to conclude that Florida's jurisdiction over the child had clearly lapsed. *See Templeton,* 595 F.Supp. at 774–75. We cannot reach

---

**14.** Having failed to comply with its own state laws—ICPC procedures for interstate placement—the *Templeton* court determined that California could not invoke jurisdiction under the "home state" provision of the PKPA. The court reached this conclusion by observing that "§ 1738A(d) clearly states that a state court's jurisdiction 'continues as long as the requirement of subsection (c)(1) continues to be met,' and that provision requires that a state court

'[have] jurisdiction under the law of such state.' " 595 F.Supp. at 775.

**15.** Apparently, none of the procedures typically performed in connection with an out-of-state placement, which includes an investigation of the prospective home, were performed when the two-day old infant was released by its mother to the attorney representing the prospective adoptive parents. *Matter of Baby "E",* 427 N.Y.S.2d at 711.

that conclusion at this point, however, because the issue before this Court is jurisdictional and does not include either the merits of the original placement [16] or a determination as to the best interests of C.H. Although this Court can not at this time arrive at a determination of what would best serve C.H.'s interests, we believe it to be of great importance that this issue be resolved. This Court cannot, however, ignore its *parens patriae* duty to protect the best interests of C.H. *See Matter of Baby "E."*, 427 N.Y.S.2d at 711–12.

This Court's *parens patriae* responsibility to protect the best interests of a child compels us now to remand this case to the Putnam County Circuit Court for an evidentiary hearing to determine what the best interests of C.H. require in compliance with the case of *In the Interest of Brandon L.E.*, 394 S.E.2d 515 (W.Va.1990) where we recently ruled that:

> If a child has resided with an individual other than a parent for a significant period of time such that the nonparent with whom the child resides serves as the child's psychological parent, ... the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him. ...

*Id.* at Syl. Pt. 4, in part.

We wish to clarify that at the time we delivered our July 20, 1989 order, we did not have the evidence before us concerning the alleged breach of financial responsibility of the DHS and HRS. Therefore, rather than chastise Judge Watt for taking testimony at the hearing on November 13, 1989, this Court concurs with the exercise of his discretion. Once the circuit court was apprised of the alleged breach of the ICPC based on termination of financial support as well as the intention of the HRS to place C.H. into the hands of complete strangers in a parking lot later that same day, with

nary a thought to what effect such a rapid and dramatic change would have on a four-year-old boy's life and emotional adjustment, the court properly acted within its discretion to take testimony concerning these matters. The record of the hearing indicates that the judge intended no contumacious conduct; he merely refused to sever all common sense and human compassion from the law as the bureaucracy went rolling along.

Thus, we find that Judge Watt correctly distinguished between this Court's declaration in the July 20, 1989 order that the West Virginia court did not have jurisdiction to inquire into the underlying placement and the separate issue of whether the best interests of the child mandated further inquiry into this matter. As a result of Judge Watt's exercise of discretion, we have thus gained insightful and invaluable information regarding circumstances in C.H.'s life that had to that point remained unknown. It is this very information that now compels us to ensure that the best interests of C.H. are considered in any decision regarding his ultimate custodian[s].

Upon remand, this Court is entitled to take evidence concerning the alleged termination of financial support and supervision by the Florida and West Virginia agencies. If the court concludes that financial support or supervision was terminated in violation of the ICPC, then the circuit court's decision regarding the best interests of C.H. can be made without concern that the ICPC has been ignored or avoided as Florida's jurisdiction will have lapsed. *See Templeton*, 595 F.Supp. at 774–75. Regardless of whether Florida's jurisdiction under the ICPC is determined to have lapsed, the Putnam County Circuit Court must make any determination regarding a change in C.H.'s custodial arrangement pursuant to the guidelines established in our recent holding in *In the Interest of Brandon L.E.* at Syl. Pt. 4, in part. By this holding, we certainly do not mean to denigrate the ICPC or its importance. We

---

**16.** This Court's entry of the July 20, 1989 order resolving a certified question in the underlying case leaves no question that West Virginia, as the receiving state, has no authority to address the merits of the original placement.

merely recognize that when the facts of a case, such as those present here, compel the exercise of our *parens patriae* duty to protect a child's best interests, that duty outweighs the competing interests of abiding by a strict and uncompromising reverence to the Compact, especially when there was not concomitant devotion to its terms by either the sending or receiving state.

For the reasons stated in this opinion, we hereby deny the petitioner's request for a writ of mandamus and remand this case to the Circuit Court of Putman County for further proceedings consistent with this opinion.

Writs denied; Remanded.