597 A.2d 456

**In re ADOPTION NO. 10087 IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY.**

**No. 92, Sept. Term, 1990.**

Court of Appeals of Maryland.

Oct. 30, 1991.

398

Harvey Schweitzer (James A. Shrybman, Shrybman & Associates, on brief) Silver Spring, for petitioner.

No respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, and KARWACKI, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), and BRUCE C. WILLIAMS, Chief Judge of the Fifth Judicial Circuit of Md., Specially Assigned.

CHASANOW, Judge.

In 1947, Chief Justice Eather of the Supreme Court of Nevada wrote,

"Unquestionably the most difficult and perplexing problems which ever come before a court for decision are those questions which, while involving no financial consideration, have to do with those vitally important but wholly imponderable questions of human relations involving ... the care, custody, control, and welfare of a minor child."

▮▮▮▮▮▮

*Ex parte Schultz*, 64 Nev. 264, 181 P.2d 585, 585 (1947). His statement is no less true today. This case vividly presents the difficult issues that may arise in the private adoption of an out-of-state child. There are two facets to the problem: 1) regulation of independent adoptions by the individual states, and 2) cooperation between the states under the Interstate Compact for the Placement of Children (ICPC). Although this case may raise more questions than it answers, we believe it is appropriate to resolve the dilemma by examining the best interests of the child. We begin with a statement of the facts.

The case at bar involves an independent adoption facilitated by an attorney.[1] Petitioners seek to adopt an infant boy who was born on May 28, 1989, in Virginia. They allege that, prior to the baby's birth, they were contacted directly by the natural mother in response to an ad they placed in a Potomac newspaper. In that ad, to protect their anonymity, petitioners identified themselves by a false surname and gave a post office box as their address. Both natural parents executed consents and affidavits to be filed in the anticipated adoption proceedings. At the time of execution, either the documents did not contain the names and address of the adoptive parents or their names and address were hidden from the natural parents' view. This was done openly with the express knowledge of the natural parents as set forth in the consents. The natural parents never knew the names or address of the adoptive parents, although petitioners aver that they met face-to-face and had several telephone conversations.

---

1. "As a general rule, when an agency is involved in the adoption process, the child is placed in foster care while the agency determines whether the prospective adoptive parents are fit for parenthood. In independent adoptions the natural parents and prospective adoptive parents negotiate either directly or through attorneys. Since no agency is involved the natural parents have greater control over the selection of the adoptive parents and often release the child into the temporary custody of the adoptive parents pending the final act of the court granting adoption." *In re Lynn M.*, 312 Md. 461, 464 n. 1, 540 A.2d 799, 800 n. 1 (1988).

Prior to the birth of the child, petitioners sought to invoke the ICPC by notifying the compact offices in both Maryland and Virginia of the approaching adoption. The Virginia compact office notified the attorney for petitioners that it requires that the ICPC–100A form, which initiates the process, must be completed in the natural mother's handwriting, including the names and address of the adoptive parents. In instituting this requirement, the Virginia compact office relied on an opinion of the Virginia Attorney General, *Adoption. Implementation of Interstate Compact for Placement of Children Requires Compliance with Virginia's Placement Laws*, 1984–85 Report of the Attorney General 3 (July 6, 1984) (hereinafter Va. Att'y Gen.Op.). It appears that the Maryland compact office has no such requirement. Petitioners refused to file a handwritten 100A form in Virginia, and the Virginia compact office refused to "facilitate" the adoption. In the meantime, according to petitioners, the Maryland compact office received all the necessary paperwork to process and approve the placement, but it was unable to act until Virginia fulfilled its "obligations" under the ICPC.

When the child was released from the hospital, petitioners attempted by telephone to obtain the approval of the Maryland compact office to transport the child to Maryland, but they were told that the appropriate person was out of the office. They then, without the sanction of either the Maryland or the Virginia compact office, transported the baby across the state line in violation of Maryland law and the ICPC.[2] The following day, petitioners notified the Mary-

---

**2.** Maryland Code (1984), Family Law Article, § 5–604(a) provides, in pertinent part, as follows:

"(a) *Sending agency to comply with laws.*—No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applica-

land and Virginia compact offices that the placement had occurred.

Petitioners immediately filed their adoption petition with the Circuit Court for Montgomery County. After providing the judge with additional information he had requested, petitioners were notified by the court that the case was being referred for investigation to the court investigator. Before that investigation was complete, however, the judge dismissed the adoption petition. The judge found that the placement was made in violation of the ICPC and that the consents were "invalid in that the natural parents did not know the identity of the persons to whom they were giving consent and in that information of a material nature which purported to be a part of the consent was wrongfully added by other persons than the consenting parents after the signatures of the parents were obtained." The Court of Special Appeals affirmed the judgment of the circuit court in an unreported opinion. No further effort has ever been made by the Maryland or Virginia compact offices or by any other state agency to assess the placement or to remove the child from petitioners' care, where he remains to this day. Petitioners claim that they can no longer locate the natural parents.

This case may not be resolved by any simple application of law to facts. Society's interest in providing a mechanism for adoption of children whose parents are unable or unwilling to care for them by persons who desire that responsibility is profound. Equally significant is the state's obligation to regulate adoptions in order to protect the interests of the child, as well as the interests of the natural parents and the

---

ble laws of the receiving state governing the placement of children therein.

* * * * * *

(d) *Required notice concerning interests of child.*—The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child."

adoptive parents, and to prevent the black market trade of infants. "[T]he black market, which has been well described as a 'taint on civilized society,' involves a marketeer who is simply trafficking in babies. The welfare of the child is subordinated to the profit...." G. Douthwaite, *Unmarried Couples and the Law* 46–47 (1979) (footnote omitted). In contrast to the black market, however, a "gray" baby market exists "where the intermediary, perhaps an attorney, a physician or a well-meaning friend of the parties, receives no fee, though perhaps the adopting couple pay the expenses of the mother's confinement and delivery. Most states, though not actually prohibiting this form of transaction, regulate it in some way...." *Id.* at 47 (footnote omitted); *see also* B. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb.L.Rev. 292, 304 (1989) (hereinafter Hartfield). This case presents the question whether this type of interstate "gray" market adoption is governed by the regulations of the state where the child is born, the state where the adoptive parents reside, or both.

## I. INTERSTATE COMPACT FOR THE PLACEMENT OF CHILDREN

"An interstate compact is basically an agreement, between two or more states, entered into for the purpose of dealing with a problem that transcends state lines." P. Hardy, *Interstate Compacts: The Ties That Bind* 2 (1982); *see Dutton v. Tawes,* 225 Md. 484, 500, 171 A.2d 688, 696, *cert. denied,* 368 U.S. 345, 82 S.Ct. 385, 7 L.Ed.2d 342 (1961); *Canal Co. v. Rail Road Co.,* 4 G. & J. 1, 128–29 (1832). A compact arises when two or more states enact essentially identical statutes which govern an area of mutual state concern and define the compact, its purposes, and policies. P. Hardy, *supra,* at 2; *see Canal Co.,* 4 G. & J. at 130–34. Thus, a compact serves a dual role. It is the law of each state that enacts it, and it is an agreement between those states. In this case, there are two aspects to our treatment of the ICPC. First, we deal with that aspect that

involves an agreement between states. Second, we are concerned with that aspect of the ICPC that constitutes the law of Maryland, its violation and enforcement. *C.T. Hellmuth v. Washington Metro. Area Trans.*, 414 F.Supp. 408, 409 (D.Md.1976).

The ICPC has been enacted in 49 states, Hartfield at 293 n. 1, including Maryland, Maryland Code (1984 & 1990 Cum.Supp.), Family Law Article, §§ 5–601 to 5–611, and Virginia, Virginia Code (1949, 1987 Repl.Vol.), Chapter 10.1, §§ 63.1–219.1, 63.1–219.2. It was "intended to facilitate interstate adoption, thereby increasing the pool of acceptable homes for children in need of placement." Hartfield at 293. To accomplish this purpose, the ICPC "extend[s] the jurisdictional reach of a party state into the borders of another party state for the purpose of investigating a proposed placement and supervising a placement once it has been made." Hartfield at 296. To accomplish these goals, the ICPC requires that

> "[n]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child … as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein."

Family Law Art., § 5–604(a). "Sending agency" is defined in section 5–603(2) as "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a *person*, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state." (Emphasis added.) Petitioners admit that "[t]he 'sending agency' was the natural parents." This conclusion follows from the inclusion of the word "person" in the statute. As recognized in *Cornhusker Chr. Ch. Home v. Dept. of Soc. S.*, 229 Neb. 837, 429 N.W.2d 359, 362 (1988): "There is nothing within the compact to indicate that, for the purposes of this statute, parents are not

persons, and in the absence of such an indication, we should not construe the language to eliminate parents from the class of persons." Furthermore, at least one court has found that adoptive parents are not exempt from this class of "persons." *See In re Adoption of C.L.W.*, 467 So.2d 1106 (Fla.Ct.App.1985).

The conclusion that parents may be the "sending agency" is further buttressed by the fact that the compact provides, in section 5–609(1), that it is not applicable to "the sending or bringing of a child into a receiving state by the child's parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or guardian *and* leaving the child with any such relative or non-agency guardian in the receiving state." (Emphasis added.) This provision would be meaningless if natural parents were not otherwise considered to be a sending agency under the compact. In this case, the natural parents and the petitioners were not acquaintances, much less related to one another. The initial link that joined them in the adoption process was a newspaper ad. Thus, they are not excused from compliance by section 5–609. Observance of the procedures of the ICPC was mandatory.

## A. VIRGINIA'S RESPONSIBILITY UNDER THE ICPC

█ Petitioners contend that Virginia, in refusing to accept their application for interstate placement in this case, violated the ICPC. They claim that Virginia's policy in requiring a handwritten 100A form superimposes Virginia adoption law on the ICPC which specifically requires only compliance with the terms of the ICPC and with the law of the receiving state, in this case Maryland. Md.Code, Family Law Art., § 5–604(a); Va.Code, Ch. 10.1, § 63.1–219.2, Art. III(a); *see* Va.Att'y Gen.Op. at 3–4. The adoption laws of Virginia and Maryland conflict with regard to the license requirement for a child placement agency. Maryland excepts from the license requirement attorneys who "prepare pleadings necessary to accomplish the adoption of a child or ... perform any other function associated with the normal

practice of law." Md.Code (1984), Family Law Art., § 5–507(b)(3). Virginia does not. *See* Va.Code (1949, 1987 Repl.Vol., 1990 Cum.Supp.), Ch. 10, § 63.1–196. Virginia claims that its policy of requiring a handwritten consent assures that the natural and adoptive parents are dealing directly and without the benefit of an unlicensed intermediary.[3] The Virginia Attorney General has addressed this question:

> "Your ... question is whether it would be proper, under the ICPC ..., for the [Virginia Department of Social Services] to help effect the direct placement of a Virginia child in another state when it is apparent that a party not licensed as a child-placing agency has helped the biological and/or adoptive parent(s) in locating and effecting the adoptive placement and no licensed agency is involved.
>
> ... [A] person involved in effecting the 'placement' of a child ... is a child-placing agency and must, therefore, meet appropriate licensure requirements. Failure of such person to comply with those requirements can result in a conviction of a misdemeanor or in the enjoining of such behavior. Because such behavior could be found to be illegal, I am of the opinion that it would be inappropriate for you to help effect the placement of a Virginia child in another state, when it is apparent that a party not licensed as a child-placing agency has assisted the biological and/or adoptive parent(s) in locating and effecting the adoptive placement." (Citations omitted.)

Va.Att'y Gen.Op. at 4.

■ The ICPC does not specifically direct that the child placement laws of the sending state must be observed. It does, however, indicate that it is a stated purpose and policy

---

3. On July 1, 1989, approximately one month after this placement, Virginia Code (1949, 1987 Repl.Vol., 1990 Cum.Supp., 1991 Interim Supp.), Chapter 11, § 63.1–220.3, covering private placements, became effective. It requires, in subsection B.3 that "[t]he birth parent(s) and adoptive parents have exchanged identifying information including but not limited to full names, addresses...."

of the ICPC that "[t]he proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to *evaluate* a projected placement before it is made." Md.Code, Family Law Art., § 5–602(3); Va.Code, Ch. 10.1, § 63.1–219.2, Art. I(c) (emphasis added). This statement implies that it is the policy of the ICPC that the sending state evaluate the placement in the first instance. Otherwise, "[t]he ICPC might then be interpreted as encouraging the placement of children in violation of the placement laws of the sending state or as repealing the placement laws of the sending state in cases of interstate placement." Hartfield at 315. The policy of requiring sending state approval is justified by the principles of comity and by the long-standing principle that the sending state stands in *parens patriae* to the child and is obligated to assure its welfare.[4] It is not unreasonable for a state to fulfill this responsibility by insisting upon compliance with its child placement laws. As was observed in *State v. Svenson:* "We cannot conclude ... that the parties thereto intended by the provisions of the compact to divest themselves of the power to legislate upon the subject embraced therein...." 104 Wash.2d 533, 707 P.2d 120, 124 (1985) (quoting *State v. Huse,* 183 Wash. 560, 563, 49 P.2d 25, 26 (1935), in turn quoting *P.J. McGowan & Sons, Inc. v. Van Winkle,* 21 F.2d 76, 77 (D.Or.1927), *aff'd,* 277 U.S. 574, 48 S.Ct. 435, 72 L.Ed. 995 (1928)). Indeed, the Secretariat,

---

**4.** "A frequent criticism of independent adoptions is that they fail to protect the interests of the child because, in most states, the prospective adoptive home is not investigated by a licensed child placing agency *before* the placement occurs. Once the placement occurs, even if the post-placement investigation reveals deficiencies in the prospective adoptive parents or in the home environment, removal of the child is unlikely unless the deficiencies are severe. Thus, it has been argued that the child is deprived of the best available placement to which he or she is entitled by the best interests standard which governs adoption. Under this view, independent adoption allows a child to be placed with the highest bidder, rather than with the adoptive parents best able to fulfill all the child's needs—emotional as well as material." B. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb.L.Rev. 292, 304 (1989) (emphasis in original, footnotes omitted).

who is responsible for coordination of the ICPC nationwide, has opined that the ICPC requires compliance with the laws of the sending state. American Public Welfare Association, *The Interstate Compact on the Placement of Children: Compact Administrators' Manual* (1982) at 3.67 (Secretariat Opinion 37 (April 7, 1977)); *see also id.* at 2.2–2.3 (Compact Provisions, An Interpretive Commentary).

Professor Hartfield points out that "one of the goals of the ICPC is to prevent forum shopping ... at the expense of the child." Hartfield at 307. She suggests that adoptive parents sometimes knowingly fail to comply with the provisions of the ICPC because "one of the states might prohibit or impose greater restrictions on independent placements." *Id.* at 305. In the instant case, petitioners' action in removing the child from the state without consent obstructed Virginia's legitimate right and obligation to oversee the welfare of its citizens, that is, the child and his natural parents. For these reasons, we do not accept petitioners' contention that Virginia violated the ICPC by refusing to accept their application. *See also People v. Thompson,* 87 Misc.2d 302, 384 N.Y.S.2d 974, 978 (1976) (in construing an interstate compact regarding supervision of parolees, the court recognized that "there is nothing in the compact to compel a state to receive a parolee.... There is, therefore, no basis upon which this Court may compel that consent be given").

## B. MARYLAND'S RESPONSIBILITY UNDER THE ICPC

■ Apparently, "it often happens that children are placed from one compact state into another without observing compact procedures." *Matter of Adoption of Baby Boy M.G.,* 135 Misc.2d 252, 515 N.Y.S.2d 198, 201 (Surr.Ct. 1987); *see also* Hartfield at 302. Despite Virginia's failure to address this placement, once the child was present in Maryland, the Maryland compact office was capable of mitigating any potential harm to the child. While it may be the usual practice for the receiving state to initiate its

evaluation of the placement upon receipt of information from the sending state, the ICPC does not preclude Maryland from considering the placement, absent Virginia's consent, once the child is present in this state. Although most states that subscribe to the ICPC have enacted regulations requiring involvement of the compact administrator of the sending state, Hartfield at 315, Maryland does not appear to be one of them. Petitioners represent that they filed with the Maryland compact office all of the same documentation that was filed with Virginia.[5] Once the Maryland compact office was notified that the child had been placed with potential adoptive parents in Maryland, it should have initiated its investigation of the placement, regardless of whether it had received notification from Virginia. The primary purpose of the ICPC is to assure that the child being placed receives "the maximum opportunity to be placed in a suitable environment ... with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." Family Law Art., § 5–602(1). The Maryland compact office is not relieved of its responsibility to assure a child's welfare upon its arrival in Maryland simply because the state from whence the child came has not evaluated the placement. The best interest of the child dictates that noncompliance with the ICPC in transporting a child into the state should be carefully investigated at the earliest opportunity, not ignored.

## C.  VIOLATION OF THE ICPC

The ICPC is a duly enacted Maryland law. Md.Code (1984 & 1990 Cum.Supp.), Family Law Art. §§ 5–601 to 5–

---

**5.** The ICPC provides that the receiving state "shall be entitled to receive" from the sending agency's state "such supporting or additional information as it may deem necessary under the circumstances to carry out the purpose and policy of this compact." Maryland Code (1984), Family Law Article, § 5–604(c). It does not appear from the record that Virginia possessed any additional information that would have been necessary to an evaluation of this placement by the Maryland compact office.

611.[6]  Petitioners violated that law by transporting this infant to Maryland without the consent of the Maryland compact office. Violation of the ICPC is punishable "in either jurisdiction in accordance with its laws"[7] and by suspension or revocation of the license "or other legal authorization" which empowers the sending agency to place children. Family Law Art., § 5–605. At least one court has applied that sanction in a private adoption. In *Matter of Adoption of T.M.M.*, 186 Mont. 460, 608 P.2d 130 (1980), the Supreme Court of Montana construed the definition of "sending agency" in the ICPC to include the adoptive parents, stating that they "brought the child ... from Mississippi to Montana for placement with themselves in furtherance of their ultimate desire to adopt the child." *Id.*, 608 P.2d at 132. Holding that the mother's consent was the "legal authorization" which empowered them to place the child with themselves for adoption, the court found,

> "Thus the failure of the prospective adoptive parents to comply with the terms and procedures of the Compact constitutes full and sufficient grounds for the revocation of the 'parent's consent.'"

*Id.*, 608 P.2d at 134. Under this analysis, which we neither accept nor reject, petitioners could be forced to deliver the child to the appropriate state agency in Maryland or Virginia; but to do so in this case would most penalize the only innocent party involved, the child.

> "The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, ... must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient. Yet, even then, circumstances may require that in the best interest of the child, the unlawful acts be blinked."

---

**6.** It is also the law of Virginia, the violation of which is not at issue before this Court.

**7.** No other Maryland law imposes a penalty for violation of the ICPC.

*Bennett v. Jeffreys,* 40 N.Y.2d 543, 550, 387 N.Y.S.2d 821, 827, 356 N.E.2d 277, 284 (1976).

The "golden rule" of adoption in Maryland is, and has always been, the best interest of the child. *In re Lynn M.,* 312 Md. 461, 463, 540 A.2d 799, 800 (1988). The appropriate forum for final determination of the best interest of the child is the adoption proceeding in the circuit court. *See id.* at 466, 540 A.2d at 802. What, then, can a court do to protect a child who has been brought into Maryland without the approval of the Maryland compact office?

## D. ROLE OF THE COURT

■ Petitioners' failure to comply with the ICPC does not deprive Maryland of jurisdiction over the adoption. The ICPC contemplates adoption in the receiving state. While compliance with the compact is designed to assure the child's welfare pending that adoption, the circuit court has "exclusive power to sever the legal ties between parent and child by allowing the adoption of the child by another." *Id.* Approval of the compact office is necessary to assure, at the outset, that a placement is not contrary to the child's welfare; but it is not a substitute for a judicial determination of the child's best interest, nor is it a prerequisite to jurisdiction. The child who is the subject of this proceeding has now been present in Maryland for approximately two years, and the adoptive parents are domiciled in Montgomery County. Circuit courts have jurisdiction over adoptions in Maryland. Md.Code (1984, 1990 Cum.Supp.), Family Law Art., § 1–201(a)(1). Section 6–203(e) of Md.Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, provides that "venue for a proceeding for adoption of a person who is *physically within* the State" (emphasis added) is in a county where the petitioner is domiciled or has resided for at least 90 days next preceding the filing of the adoption petition. Therefore, the Circuit Court for Montgomery County was an appropriate forum to consider this adoption petition.

■ The fact that the ICPC had been violated in this case does not mandate dismissal; rather it indicates the need for a prompt determination of the best interest of this child. We hold that, in the instant case, the circuit court erred in dismissing this adoption petition. In the face of ICPC violation, a circuit court is not limited to granting the adoption without ICPC approval or denying the petition for adoption. It may consider other alternatives, including requiring retroactive ICPC compliance. *See* Hartfield at 306. Obviously, to simply grant an adoption without compact approval undermines the effectiveness of the ICPC. We therefore reject this option absent extraordinary circumstances.

■ With regard to denial of an adoption for failure to comply with the ICPC, we have found one case that accomplished this result. As discussed above, in *Adoption of T.M.M.*, the Supreme Court of Montana found that the prospective adoptive parents had violated the ICPC by transferring the child from Mississippi to Montana without complying with the compact. The sanction imposed for this violation was revocation of the natural mother's consent to the adoption. In the absence of such consent, the adoption petition was dismissed and the child returned to its natural mother. The Montana court never discussed the best interest of the child, but the child's natural mother was a party to the proceedings. Such summary dismissal of an adoption petition on a procedural basis without consideration of the child's welfare is not appropriate where the only parties before the court seeking custody of the child are the prospective adoptive parents. In such a case, summary dismissal would require that the child be left in limbo or placed in the custody of either the Maryland or Virginia child welfare agencies. If the child is thriving in a household where the petitioners for adoption are the only parents the child has known, it may be adverse to the child's best interest to remove it to a social services agency solely because the adoptive parents violated the ICPC. It is not necessarily true, however, that the child is always better off with the

prospective adoptive parents rather than with a state agency. *See, e.g., Denver DSS v. Dist. Court of 18th Jud. D.,* 742 P.2d 339 (Colo.1987) (where 2–year–old child died of "unknown and allegedly nonaccidental causes" and two others were allegedly abused during preadoptive placement).

Where a placement has been made in violation of the ICPC, there may have been no official preliminary determination that the placement "does not appear to be contrary to the interests of the child," as required by Family Law Art., § 5–604(d). To protect the child, that determination should be made at the earliest opportunity. Requiring, whenever practicable, a retroactive compliance with the ICPC would accomplish that purpose, as well as promote, to the extent possible, the integrity of the compact.

> "The predicament which the courts face is whether to allow the best interests of the child standard to control when the ICPC has been violated. If the best interests standard controls, then the adoption may be granted despite violation of the ICPC. Alternatively, if the violation of the ICPC is fatal to an otherwise desirable adoption, then a child may be deprived of the only family he has ever known, returned to a natural parent who is marginally capable of providing adequate care, or placed in foster care to await an uncertain future. Undoubtedly, it is the potentially harsh result, contrary to the best interests of the child, that has caused the compact administrators, the Secretariat, and the courts to countenance retroactive compliance with the ICPC and, where that is not possible, finalization of adoptions despite noncompliance."

Hartfield at 319. Based on these considerations, we believe the most appropriate course, where a child has been placed in the State of Maryland in violation of the ICPC, may be to require, whenever practicable, retroactive compliance with the compact. In reaching this conclusion, we recognize "the circularity of the problem.... [B]oth retroactive com-

pliance and finalization of adoptions despite ICPC violations encourage subsequent violations." *Id.* At least one jurisdiction has utilized an innovative remedy—the refusal to approve the amount of attorney's fees as requested when the ICPC has been violated. *See Matter of Adoption of Calynn, M. G.,* 137 Misc.2d 1005, 523 N.Y.S.2d 729 (Surr.Ct. 1987). The Maryland General Assembly may wish to address the concerns raised by the limited ability to enforce the ICPC in private adoptions.

We stress that it should not be concluded from this decision that it is permissible to illegally remove a child from another state and hold it in Maryland until a sufficient time elapses so that the child's welfare dictates adoption. The particulars of this case are unique in that neither the natural parents nor the state of Virginia have, so far, sought to exercise their claims over the child. In addition, at the time they brought the child into Maryland, the petitioners had sought to comply with the ICPC and were acting under the misconception that their act was not wrongful and that compact approval would be immediately forthcoming.

Under these circumstances, it appears to be in the best interest of this child that we remand the case to the Circuit Court for Montgomery County for a determination of whether adoption by petitioners is in order at this time. In doing so, we note the circuit court's dilemma over the consents filed with the adoption petition. We believe, however, that it was not appropriate to simply dismiss the adoption petition where the child was in the custody of strangers and incapable of returning to his natural parents. Where the welfare of a child is at stake, the court should not, like Pontius Pilate, wash its hands of the matter. Under such circumstances, even if adoption is not in order, the court should still evaluate the best interest of the child and consider whether some action should be taken to assure the child's needs will be met until a permanent resolution can be achieved.

## II. CONSENT TO ADOPTION

In addition to violation of the ICPC, the judge based the dismissal of this adoption petition, upon his finding that the consents were invalid "in that the natural parents did not know the identity of the persons to whom they were giving consent and in that information of a material nature which purported to be a part of the consent was wrongfully added by other persons than the consenting parents after the signatures of the parents were obtained." The validity of such a blank consent to adoption appears to be a question of first impression in Maryland.

### A. BLANK CONSENT

The reported cases dealing with the issue of validity of blank or blanket consents to adoption fall into two general categories. The first category treats the consent as merely a relinquishment of parental rights, in which case the identity of the adoptive parents is immaterial. The argument in favor of this approach is stated in *Barwin v. Reidy*, 62 N.M. 183, 307 P.2d 175, 181 (1957),

"Since adoption may be refused to petitioners who have the strongest endorsement of the parents, we think it follows that the office of the requirement of consent for adoption is to indicate the willingness of the parents that the natural relationship be swept away and a new one created in its stead. The giving of consent is indicative of the subjective state of mind of the parents—expressive only of the individuals and binding no one unless the court shall choose to act thereon. It is up to the court to perform the objective acts of severing the natural relationship and creating an artificial status by judicial determination. As it may or may not decree adoption in favor of persons recommended by the natural parents, it seems most unlikely the legislature intended to impose as a condition to the exercise of the court's jurisdiction knowledge of the identity of petitioners in adoption on the part of the natural parents, because even when that circumstance exists, and possibly the further circumstance that

the natural parents have investigated the qualifications of the petitioners and given them their unqualified approval, the court may still refuse to decree adoption, the selection of a foster parent being a judicial act and the responsibility being that of the court."

See In re Adoption of a Minor Child, 127 F.Supp. 256 (D.D.C.1954); Wolf v. Smith, 435 So.2d 749, 751 (Ala.Civ. App.1983); McKinney v. Weeks, 130 So.2d 310 (Fla.Dist.Ct. App.1961); Cohen v. Janic, 57 Ill.App.2d 309, 207 N.E.2d 89 (1965); Johnson v. Cupp, 149 Ind.App. 611, 274 N.E.2d 411, 415 (1971); Matter of Adoption of Jackson, 89 Wash.2d 945, 578 P.2d 33, 36–37 (1978). This notion is also espoused by the Uniform Adoption Act, § 7(b), 9 U.L.A. 40 (1988 & 1991 Cum.Supp.), which has been adopted in Alaska, Arkansas, Montana, North Dakota, and Ohio:

"(b) A consent which does not name or otherwise identify the adopting parent is valid if the consent ... contains a statement by the person whose consent it is that the person consenting voluntarily executed the consent irrespective of disclosure of the name or other identification of the adopting parent."

The Comment to this section addresses the question head-on:

"Subsection (b) is designed to clarify a point which seems to be ambiguous under some law as to whether the consent must be a consent to adoption by a particular individual. The subsection authorizes a consent 'in blank' if the form of the consent contains a statement that a person consented voluntarily without disclosure of the name or other identification of the adopting parent."

In the second category of cases, the consent is viewed not as a mere relinquishment of parental rights, but as a consent to adoption by specific individuals identified therein. See Jensen ex rel. Jensen v. Creason, 264 N.W.2d 735, 738 (Iowa 1978); Matter of Adoption of X, 84 Misc.2d 770, 376 N.Y.S.2d 825, 831 (Surr.Ct.1975); Ward v. Howard, 217 N.C. 201, 7 S.E.2d 625, 628 (1940); Adoption of Ashton, 374 Pa. 185, 97 A.2d 368, 370 (1953); see also Las Vegas Sun v.

*Franklin*, 74 Nev. 282, 329 P.2d 867, 871–72 (1958). Under this theory, the petitioners for adoption must establish that they are, in fact, the persons to whom the natural parents consented.

There are two consents at issue in this case. The natural father's consent to this adoption does not purport to identify the adoptive parents. It simply states, "I, ..., do hereby consent to the adoption of this child by the adopting parents chosen by [the natural mother]...." The consent of the natural mother states, "I, ..., do hereby consent to the adoption of this child by the adopting parentss [sic]: [natural parents names and address]." The mother's consent further states,

"I specifically understood that the last name and residence of the parents adopting the baby would be unknown to me. When this document was presented to me for my signature, the last name of the adopting parents were omitted or masked from my view, as was their address. This was done with my full knowledge and consent to preserve the identity of the adopting parents and the confidentiality of the adoption proceedings."

Maryland Code (1984, 1990 Cum.Supp.), Family Law Art., §§ 5–311 and 5–314 cover consents to adopt in Maryland. Section 5–311 states, in pertinent part,

"(a) *In general.*—Unless the natural parents' rights have been terminated by a judicial proceeding, an individual may not be adopted without the consent of: (1) the natural mother; (2) the natural father....

(c) *Revocation of consent.*—(1) ... within 90 calendar days after the required consent to an adoption is filed under this section, or any time before a final decree of adoption is entered, whichever occurs first, the individual or agency executing the consent may revoke the consent....

(3) Except as provided in paragraph[ ](1) ... of this subsection, the required consent to an adoption filed

under this section may not be revoked at any time by the individual or agency executing the consent."

Section 5–314 provides, in pertinent part,

"(a) *Required notice.*—The consent of a natural parent to ... an adoption ... of a child is not valid unless the consent contains an express notice of the right to revoke consent under § 5–311 ... of this subtitle...."

The statutes do not distinguish between agency and independent adoptions and do not clearly indicate whether the Legislature intended that parents who sign consents in independent adoptions must know the identities of the adoptive parents. The issue of confidentiality in an adoption is one of great concern to adoptive parents who seek to raise their child free of interference from the biological parents. Once an adoption is enrolled, the biological parents' rights are severed permanently and irrevocably and the adoptive parents become the true parents of the child. Protection of this relationship is significant to the child's well-being. This fact is well-recognized in Maryland, as is the right of biological parents to remain anonymous. *See, e.g.,* Md.Code (1982, 1990 Repl.Vol.), Health–General Art., § 4–211(e) (requiring that upon issuance of a new birth certificate after adoption the original certificate and all records relating thereto shall be placed under seal); Md.Code (1984), Family Law Art., § 5–328 (directing one placing child for adoption to make available to adoptive parents medical history of natural parents but forbidding disclosure of identity of natural parents); Md.Code (1984, 1990 Cum.Supp.), Family Law Art., §§ 5–329 and 5–329.1 (permitting disclosure of medical information but forbidding disclosure of identity of natural parents).

Generally, where an agency is involved in an adoption, confidentiality can be achieved without compromising the child's welfare because the agency, as go-between, is the repository of identifying information for both sides. It is the responsibility of the agency to preserve that confidentiality while protecting the child's best interests. In an independent adoption, there is no go-between. Indeed, the

reason most often cited for pursuing independent rather than agency adoption by natural parents is the ability to meet and personally approve the adoptive parents. *See, e.g., S.O. v. W.S.,* 643 P.2d 997, 999 (Alaska 1982). In this case, the mother's consent states, "I want to decide on with whom to place the baby." It may appear that confidentiality is not an issue because the parties have met. In practice, however, although the parties may meet or talk by telephone, often, as in the instant case, no identifying information is exchanged. While the natural parents may meet a couple and approve of them to adopt the child, the adoptive parents' confidentiality is preserved because the natural parents are incapable of identifying them. This may, however, cause the concern expressed by the circuit judge. If the natural parents are incapable of identifying the adoptive parents they choose, how can the court granting the adoption be assured that the parties seeking the adoption are the same persons to whom the natural parents consented? There is a risk that the use of blank consents may fuel the "black market" for infants because no safeguards assure fulfillment of the intent of the natural parent who chooses independent placement in order to personally approve the adoptive parents. *Herman v. McIver,* 248 Iowa 619, 80 N.W.2d 500, 504 (1957); *see also Las Vegas Sun v. Franklin,* 329 P.2d at 871–72 ("[W]ithout some measure of control, consents in blank in the hands of unscrupulous persons could reduce children of adoption to the commercial status of negotiable paper").

As is clear from our discussion of the ICPC, Virginia has refused to risk the use of blank consents by requiring birth and adoptive parents to exchange identifying information. *Supra* note 3. This refusal to permit confidentiality in independent adoptions ensures that the placement is truly "independent" and that the parties are indisputably dealing directly with one another. It severely limits this child placement option, however, because many adoptive parents do not want to disclose their identities and risk future interference from biological parents. It also precludes ano-

nymity of natural parents who desire to give up their children for adoption.

Such an approach may not be necessary to protect against the improper use of blank consents. There are other means by which petitioners for adoption may demonstrate to the court that they are in fact the persons to whom the biological parents consented. For example, the attorney for the natural parents or a neutral third person, such as a notary public, may be present during a face-to-face meeting of the parties and could later identify the adoptive parents as the persons with whom the natural parents dealt; or the consent could recite the first names and a detailed physical description of the adoptive couple. We can find no basis in the legislative history of our adoption laws to assign an intent to the Maryland Legislature that confidentiality be sacrificed in all independent adoptions. Nevertheless, because a principal reason cited for pursuing private adoption is so the natural parents may approve the adoptive parents, we are unwilling, absent a clear indication of legislative intent, to reduce a consent to an independent adoption to a mere relinquishment of parental rights. On remand, the petitioners for adoption should establish to the satisfaction of the court that they are in fact the persons to whom the natural parents·directed their consents to adoption.

## B.   REVOCATION OF CONSENT

There is another aspect of these consents which we find troubling. While the legislative intent regarding confidentiality in independent adoptions may be obscure, it is crystal clear that the General Assembly intended that all consents to adoption be revocable for a period of 90 calendar days after they are filed, or any time before a final decree of adoption is entered, whichever occurs first. Family Law Art., § 5–311; *see also Haney v. Knight,* 197 Md. 212, 218, 78 A.2d 643, 646 (1951). "The consent of a natural parent to ·... an adoption ... of a child is not valid unless the consent contains an express notice of the right to

revoke consent under § 5–311...." Family Law Art., § 5–314. It is apparent that the Legislature was deeply concerned that a parent should have an unconditional opportunity to revoke a consent to adoption for a limited period of time. Section 5–314 requires that a parent be affirmatively notified of that right, obviously because the right is meaningless if the parent is not informed that it exists. Likewise, if a parent does not possess sufficient information to exercise the power to revoke, the right sought to be preserved by the Legislature is meaningless.

In this case, the consents contain a statement notifying the parents of their right of revocation. No instructions are included, however, which would advise them how to go about doing so. They did not know the identities of the adoptive parents. They were not represented by their own counsel. It is not clear from the record whether the parents received copies of the documents they executed. Even if they did, no information is given on the face of the consents which would enable a parent to recant. The documents do not identify the adoptive parents or their attorney, and the record does not disclose whether the natural parents knew the name of the attorney or how to contact him. Although the consent does indicate the court in which the case is to be filed, the caption is different from that in which the clerk docketed the petition. From these facts, it is questionable whether the natural parents had a meaningful opportunity to revoke. This issue should be investigated by the court on remand.

### III. THE DISSENT

The dissent seems to indicate "placement" whether proper or improper is irrelevant to the adoption proceedings. *See* Dissenting Op. at 433, which states that "any placement of the child, if there was one within the meaning of ICPC, has already occurred. As far as the adoption proceedings are concerned, it is a moot point." Placement should not be a "moot point"; it is illogical to suggest that a court should be unconcerned with whether a person

seeking to adopt a child secured custody of the child lawfully or unlawfully.

Maryland Code (1984), Family Law Art., § 5–304, which is part of the adoption statute, indicates placement is not a "moot point"; it provides: "This [adoption] subtitle is related to and should be read in relation to Subtitle 5 of this title." Subtitle 5 deals specifically with placement. If we ignore ICPC placement and look only to Maryland law, then this child was unlawfully placed for adoption in violation of Md.Code (1984), Family Law Art., § 5–507(c) which is required to be read in relation to the adoption statute. Section 5–507(c) provides:

"Limitation.—A parent or grandparent may not place a child for adoption without a license unless, *before the placement* is made:

(1) a petition for adoption is filed in court; and

(2) the court, by order, sanctions the placement pending final action on the petition." (Emphasis added).

Pursuant to § 5–304, the placement and its legality "is related to" and "should be read in relation to" the adoption statute. Also, the Revisor's Note to § 5–304 cross references ICPC placements and states: "As to the requirements for bringing a child into this State preliminary to possible adoption, see also § 5–604 of this title."

In addition, the dissent alleges that somehow the Court's opinion "does not square with the adoption statutes and rules." *Id.* at 435. The dissent reaches this conclusion arguing that by directing "retroactive compliance with the ICPC the majority presumably intends that the circuit court requires an investigation and recommendation by the Maryland compact office. The adoption statutes, however, already provide for investigations and evaluations in connection with petitions for adoption." *Id.* at 435. The dissent goes on to point out how these dual investigations would be a waste of government resources. Apparently the dissent misreads the Court's opinion, as well as the adoption statute.

First, this Court only directed ICPC compliance "to the extent practicable"; duplicative investigations are generally not practicable. Second, the dissent errs in citing Md.Code (1984, 1991 Cum.Supp.), Family Law Art., § 5–312 for the broad statement that the adoption statutes "already provide for investigations and evaluations in connection with petitions for adoption." *Id.* at 435. That section does mandate an investigation, but is irrelevant to the case before this Court since § 5–312(a)(1) also provides that: "This section *applies only* to independent adoptions in which a natural parent affirmatively withholds consent by filing a notice of objection." (Emphasis added). Clearly, it is inapplicable to the instant case or similar cases. Maryland Rule D75(b) does give the court *discretion* to order an investigation if the adoption proceedings are uncontested. The investigation may be conducted by "any person or agency" designated by the court. The Maryland compact office might be the appropriate agency to conduct such an investigation since the natural parents are out-of-state.

Finally, ignoring the fact that adoption proceedings are traditionally equitable in nature, the dissent repeatedly suggests that a chancellor in an adoption proceeding is limited to either granting or denying the adoption and "should not deal with matters other than whether the adoption petition should be granted under the requirements of the statutes." *Id.* at 436. The Chancellor in the instant case was of a like mind, and he simply dismissed the petition and left this child in limbo. We think that the Chancellor and the dissent are in error, and that the Chancellor is not limited to either granting or denying the adoption. The Chancellor has inherent as well as express authority, when in the best interest of the child, to "deal with matters other than whether the adoption petition should be granted." By way of example, Md.Rule D78 provides in relevant part:

"a. Duration.

The court may enter an interlocutory decree of adoption in the case of adoption of a minor, granting custody of the minor for a period not to exceed one year, retaining

jurisdiction of the proceeding, and taking such other action as it may deem in the best interests of the child.

\* \* \* \* . \* \*

c.  Review After Year.

In a proceeding for adoption in which the last decree is an interlocutory decree, the court shall review the proceeding not later than one year from entry of the last interlocutory decree, or amendment or extension thereof, and shall enter such further decree as the best interests of the child shall require.

d.  Temporary Custody.

The court may make a temporary award of custody of a minor prior to a hearing and prior to an interlocutory decree of adoption as it may deem in the best interests of the child."

We disagree with the dissent's conclusion that the chancellor should go no further than to merely grant or deny the petition, and we hold that the chancellor should do more and consider whether some additional action should be taken to provide for the child's custody and welfare until a permanent resolution can be achieved.

To summarize, we remand this case to the Circuit Court for Montgomery County.  We direct that petitioners should, to the extent practicable, retroactively comply with the terms of the ICPC.  We further direct that the circuit court order an investigation of this placement with a view to assuring (1) that the petitioners are the same persons to whom the natural parents directed their consents and (2) that the natural parents were afforded a meaningful opportunity to revoke their consents pursuant to Maryland law. The court's foremost consideration, however, should be a determination of whether adoption at this time would be in the best interest of this child.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY

AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. PETITIONERS TO PAY COSTS.

ELDRIDGE, Judge, concurring in part and dissenting in part:

I concur with the majority's decision reversing the judgments of the Court of Special Appeals and the Circuit Court for Montgomery County. I also agree with the majority that on remand the circuit court's "foremost consideration ... should be a determination of whether adoption at this time would be in the best interests of this child." I disagree, however, with the other "direct[ives]" issued to the circuit court. Compliance with such directives might result in a decision which is inconsistent with the best interests of the child.

Furthermore, I see no need for much of the majority's discussion and conclusions concerning independent adoptions, the "Interstate Compact for the Placement of Children," and various policy matters which are more appropriately the business of the General Assembly. In its present posture, this case is no different from any other circuit court child adoption proceeding governed by the Maryland statutory provisions and by this Court's decisions regarding petitions for adoption. As in other child adoption cases, the circuit court's authority is either to grant or to deny the adoption petition based upon the circuit court's determination of the best interests of the child. *See, e.g., In re Adoption No. 9979*, 323 Md. 39, 58–59, 591 A.2d 468, 477–478 (1991) (concurring opinion); *In re Lynn M.*, 312 Md. 461, 463, 540 A.2d 799, 800 (1988); *Lippy v. Breidenstein*, 249 Md. 415, 420, 240 A.2d 251, 254 (1968); *Walker v. Gardner*, 221 Md. 280, 284, 157 A.2d 273, 275 (1960); *King v. Shandrowski*, 218 Md. 38, 43, 145 A.2d 281, 284 (1958); *Ex parte Anderson*, 199 Md. 316, 322, 86 A.2d 516, 519 (1952); *Waller v. Ellis*, 169 Md. 15, 23, 179 A. 289, 293

(1935) ("the whole purpose of the [adoption] statute is to insure the welfare of the infant").

The circuit court dismissed the adoption petition in this case because of the court's conclusion that the child had been "placed" with the petitioners in violation of the so-called "Interstate Compact for the Placement of Children" (ICPC).[1] The majority opinion, while disagreeing with the circuit court, assumes without any discussion that the ICPC applies to "placements" which are preliminary to independent adoptions. The majority further assumes that a child "placement" in violation of the ICPC has major relevance in a later petition for adoption filed in a circuit court. The first assumption by the majority concerns a matter on which there appears to be a substantial difference of opinion. The second assumption has no support in either the language of the ICPC or the adoption statutes, is contrary to settled Maryland law regarding petitions for adoption, and is inconsistent with the weight of authority.

## I.

The Supreme Court of Wyoming, in the case of *In re Adoption of MM*, 652 P.2d 974, 981 (Wyo.1982), flatly held that the ICPC was inapplicable to "placements" in connection with independent adoptions like that sought in the present case. Unlike the present case where no parties are challenging the requested adoption, the Wyoming case was an appeal by the natural mother from an adoption decree. The natural mother, while pregnant and residing in New York, arranged through a mutual acquaintance to have her child given to a Wyoming couple for adoption. When the

---

1. The ICPC is not an interstate compact within the meaning of Art. I, § 10, cl. 3, of the Constitution of the United States, as it has never been consented to by Congress. Instead, the ICPC apparently purports to fall within the category of what the Supreme Court has called interstate "[a]greements effected through reciprocal legislation" not requiring the approval of Congress. *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 470, 98 S.Ct. 799, 811, 54 L.Ed.2d 682, 700 (1978).

child was born, the Wyoming couple travelled to New York, were given the child, and returned with the baby to Wyoming. Sometime later the natural mother changed her mind and filed an objection in the Wyoming adoption proceedings. One of the grounds for her objection was that there had been no compliance with the ICPC. Both New York and Wyoming had adopted the ICPC in substantially identical language, which is essentially the same as Maryland's language. *See* Maryland Code (1984, 1991 Cum. Supp.), §§ 5–601 through 5–611 of the Family Law Article. In holding the ICPC inapplicable, the Supreme Court of Wyoming stated (652 P.2d at 981):

> "We finally consider the Interstate Compact on Placement of Children, § 14–5–101 et seq., W.S.1977 and § 374–a, New York Social Services Law, McKinney's Consolidated Laws of New York, Annotated. As pointed out by SKMD, the Wyoming and New York forms are substantially identical. We agree with the trial judge that it is inapplicable. The terminology lacks cohesion with and is not adaptable to an adoption arranged privately between the consenting natural parent and the adopting parents. We find nothing in the adoption laws of Wyoming which refers to the custody by adopting parents as a 'placement.' Placement is defined in the compact, § 14–5–101, I(d):
>
> > '(d) "Placement" means the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, or a hospital or other medical facility.' [2]
>
> "While reference in § 14–5–101, II(a) of the compact is made to 'placement in foster care or as a preliminary to a possible adoption,' that does not fit into the circumstances

---

**2.** Maryland Code (1984, 1991 Cum.Supp.), § 5–603(4) of the Family Law Article is identically worded.

here, where the natural parent delivered the child to the adopting parents under a consent affidavit which stated that she 'does hereby give her consent to the adoption' of her child. There was no 'placement' *preliminary* to a *'possible'* adoption. There was relinquishment for adoption, a positive, not potential act."

The Supreme Court of Wyoming also relied on the fact that the only penalty provision in the ICPC, apart from its reference to a potential criminal penalty, was "the suspension or revocation of any license, permit, or other legal authorization held by the sending agency which empowers or allows it to place, or care for children." The Wyoming court then observed (652 P.2d at 981):

"It is hardly possible that a natural parent needs a license or a permit to have a child and give her consent to adoption."

Finally, the Supreme Court of Wyoming relied on the lack of any language creating a nexus between the ICPC and the grant of a petition for adoption, saying (*ibid.*):

"There is no provision in the adoption laws requiring compliance with the compact before a decree of adoption can be sought or entered. We just simply cannot find nexus between the circumstances here and the compact. There is no legislative intent present which makes the compact pari materia with the statutory law of adoption. Such intent is necessary. *Sanches v. Sanches*, Wyo., 626 P.2d 61 (1981). It is our view that the compact is applicable only to those engaged in the governmental or private service of placing children for care."

*See also In re Adoption of Baby Boy W.*, 701 S.W.2d 534, 542 (Mo.App.1985) (suggesting that the ICPC may not apply to a private placement for adoption which does not involve an agency). *See*, in addition, *In re Adoption of C.L.W.*, 467 So.2d 1106, 1111 (Fla.App.1985); *The Daily Record*, October 6, 1988, p. 6 (indicating that some "Maryland adoption specialists" disagree with the view of the Circuit Court for Montgomery County that the ICPC applies to independent adoptions).

As indicated previously, the provisions of the Wyoming ICPC on which the Wyoming Supreme Court relied are the same as the provisions of the Maryland ICPC. Consequently, the reasoning of the Wyoming court is fully applicable to the Maryland ICPC. Moreover, there is an additional reason under Maryland law for holding that the phrase in the ICPC regarding "placement in foster care or as preliminary to a possible adoption"[3] refers only to agency placements. The General Assembly of Maryland, in the adoption statutes, has specifically defined the phrase "[p]lacement for adoption" to mean a placement "by a child placement agency." Code (1984, 1991 Cum.Supp.), § 5–301(h) of the Family Law Article.[4]

Even Professor Hartfield, on whose law review article the majority places such great reliance, and who takes the position that the ICPC does apply where no agency is involved, acknowledges that there are questions concerning the issue, that "the ICPC was drafted as if the sending agency would in fact be an agency or court, not an individual," and that "public and private child placing agencies ... comprise the group at which the ICPC is directed." B. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb. L.Rev. 292, 316, 319 (1989).

In sum, I believe that the ICPC is inapplicable to a

---

**3.** Code (1984, 1991 Cum.Supp.), § 5–604(a) of the Family Law Article.

**4.** Section 5–301(h) states:

"(h) *Placement for adoption.*—'Placement for adoption' means the placement of a child to live with a family or individual approved for adoption by a child placement agency, with the intent that the child be adopted by the family or individual."

Section 5–301(b) defines a "child placement agency" as follows:

"(b) *Child placement agency.*—'Child placement agency' means:

(1) a local department of social services; or

(2) a private agency that:

(i) engages in the placement of children in homes or with individuals; and

(ii) is licensed by the Social Services Administration under § 5–507 of this title."

"placement" in connection with an independent adoption.[5]

## II.

Assuming arguendo that the ICPC applies to interstate placements for the purpose of adoption, and further assuming arguendo that there was a violation of the ICPC in connection with the initial placement of the baby with the petitioners, the issue in this case then concerns the relevance of such violation in a later circuit court adoption proceeding.

## A.

First, it is clear that any violation of the ICPC in the sending State of Virginia, or any violation of Virginia law, is irrelevant once the child is in Maryland and an adoption proceeding has been filed in a Maryland court. *See, e.g., In re Adoption of C.L.W., supra,* 467 So.2d at 1111 ("A court generally applies its own state law in determining whether to grant an adoption"); *Matter of Male Child Born July 15, 1985,* 221 Mont. 309, 718 P.2d 660, 664 (1986) ("Whether or not [the sending State of Montana's law was violated] is irrelevant to the child's adoption in Idaho"); *State of Fla., DHRS v. Thornton,* 396 S.E.2d 475, 481–482 (W.Va.1990). *See also* B. Hartfield, *supra,* at 315–318 (the ICPC "requires compliance with the child placement laws of the

---

**5.** If the ICPC is applicable to the placement of children in connection with independent adoptions, there could be serious problems under certain circumstances, particularly involving newborns. Suppose, for example, that an expectant mother in Virginia decides, at a relatively late stage in her pregnancy, to relinquish her child when it is born to a Maryland couple for the purpose of adoption. Also, suppose that the natural mother relinquishes the baby to the adopting parents as soon as it is born, believing "in the efficacy of immediate and permanent bonding for her child after birth," D. Leavitt, *Return to a Balanced View of Adoption,* 19 Family Law Quarterly 141, 150 (1985). If at the time the natural mother relinquishes the baby to the adopting parents, the Maryland ICPC compact office has not completed its investigation and given its consent, are the adopting parents required to wait with the baby on the south shore of the Potomac River, unable to return to their home with the baby until the Maryland compact office acts?

receiving state, but nowhere does the ICPC contain a parallel requirement of compliance with the child placement laws of the sending state"). Moreover, it is settled that "[a] court applies its own local law in determining whether to grant an adoption." *Restatement (Second) of Conflict of Laws* § 289 (1971).

The majority opinion in the instant case, at one point, seems to agree that any violation of Virginia law in this case should not be considered in determining whether the petition for adoption should be granted. At the same time, the majority devotes considerable space to the Virginia law and concludes that the petitioners in this case "obstructed Virginia's legitimate right and obligation to oversee the welfare of its citizens...." The majority also, in its discussion of consent, seems to express agreement with Virginia's policy of refusing to permit confidentiality in independent adoptions and directs that "[o]n remand, the petitioners for adoption should establish to the satisfaction of the court that they are in fact the persons to whom the natural parents directed their consents to adoption." The position of the majority is directly contrary to Maryland's public policy which strongly favors confidentiality in adoptions without distinguishing between agency and independent adoptions. *See* the various Maryland statutes cited in the majority opinion, 324 Md. at 417–420, 597 A.2d at 468–469.

In my view, the majority's action in giving effect to Virginia public policy, and its directive concerning consent, is inconsistent with the principle under the ICPC that a violation of the sending state's law and policy is irrelevant in an adoption proceeding in the receiving state. In addition, it violates the settled rule that the law and policy of Maryland govern an adoption petition filed by residents of Maryland in a Maryland court to adopt a child residing in Maryland.[6]

---

**6.** The majority justifies its apparent adherence to Virginia public policy concerning confidentiality in independent adoptions by stating

B.

The majority also takes the position that the petitioners violated the ICPC in Maryland by bringing the child into this State without the approval of the Maryland compact office. The majority then states:

"In the face of ICPC violation, a circuit court is not limited to granting the adoption without ICPC approval or denying the petition for adoption. It may consider other alternatives, including requiring retroactive ICPC compliance.... Obviously, to simply grant an adoption without compact approval undermines the effectiveness of the ICPC. We therefore reject this option absent extraordinary circumstances."

The majority opinion concludes that "the most appropriate course, where a child has been placed in the State of Maryland in violation of the ICPC, may be to require, whenever practicable, retroactive compliance with the compact." The majority "direct[s] that petitioners should, to the extent practicable, retroactively comply with the terms of the ICPC." Presumably, the majority means that there

---

that "a principal reason cited for pursuing private adoption is so the natural parents may approve the adoptive parents...." There are, however, numerous reasons for pursuing independent adoptions. In the view of several authorities, independent adoptions may be preferred to agency adoptions for newborn children for a variety of reasons. *See, e.g.,* D. Leavitt, *Return to a Balanced View of Adoption, supra,* 19 Family Law Quarterly 141; W. Meezan, S. Katz, E. Russo, *Adoptions Without Agencies: A Study Of Independent Adoptions,* pp. 9–11, 41, 90–91, 108, 113, 136, 143–144 (1978).

The majority's position concerning confidentiality in independent adoptions appears to be an example of the majority's dislike of independent adoptions. Another example is the majority's use of the term " 'gray' market adoption" for independent adoptions. *See* Leavitt, *supra,* at 151 ("Independent adoption is stigmatized as a 'gray market.' The very name infers that non-agency adoption is by nature suspect and that decent people would avoid it"). This Court, in my opinion, should refrain from expressing its views concerning the desirability of one type of adoption over another. This is a policy matter which is the business of the General Assembly, not the judiciary.

should be an investigation and recommendation by the Maryland compact office.

The majority's directive that the circuit court in this adoption proceeding require retroactive compliance with the ICPC has no support in the language of the ICPC, in Maryland adoption law, or in any reported decision in an adoption case.

As indicated earlier, the ICPC deals with the *placement* of children, not with adoptions. The initial section of the ICPC, reciting the agreement and its general provisions, does not mention "adoptions." Code (1984, 1991 Cum. Supp.), § 5–601 of the Family Law Article. Similarly, neither § 5–602 setting forth the "[p]urpose and policy" of the ICPC, nor § 5–603 containing the "definitions," include the word "adoption." The only place where the word "adoption" appears in the ICPC is in § 5–604(a), dealing with the "[p]rocedure before sending [a] child into [a] state," and requiring that the sending agency comply with the ICPC and the laws of the receiving state. Section 5–604(a) refers to a "placement in foster care or as a preliminary to a possible adoption." [7] In the present case any "placement" of the child, if there was one within the meaning of the ICPC, has already occurred. As far as the adoption proceedings are concerned, it is a moot point.[8] To read into the

---

7. Section 5–604(a) states as follows:
   "(a) *Sending agency to comply with laws.*—No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein."

8. The majority states that it is "illogical to suggest that a court should be unconcerned with whether a person seeking to adopt a child secured custody of the child lawfully or unlawfully." I am not suggesting that all statutory violations are irrelevant in a subsequent adoption proceeding. A violation of the law which reflects upon the adoptive parents' fitness as parents should obviously be considered, like any other factor that impacts on the determination of the best interest of the child. *See In re Adoption No. 9979,* 323 Md. 39, 51, 58–

ICPC, which does not mention adoption proceedings or petitions for adoption, a requirement to be applied in a circuit court adoption proceeding, is judicial legislation of an extreme nature.

Just as the ICPC does not mention adoption proceedings or petitions for adoption, the Maryland adoption statutes do not contain any reference to the ICPC. Code (1984, 1991 Cum.Supp.), §§ 5–301 through 5–415 of the Family Law Article. The adoption statutes authorize and extensively regulate petitions for adoptions and adoption proceedings, including both independent and agency adoptions. There are detailed provisions and requirements concerning the rights of natural parents, consent to adoption, the withholding or revocation of consent, the fitness of those seeking to adopt, investigations, the nature of investigations, various factors associated with the welfare and the best interests of the child, etc. In light of the comprehensiveness and detail of the adoption statutes, if the General Assembly had intended that a violation of the ICPC should be relevant in the adoption proceeding, it would have said so. The absence of any reference to the ICPC in the adoption statutes, and the absence of any reference to petitions for adoption or judicial adoption proceedings in the ICPC, virtually compels the conclusion that a violation of the ICPC is irrelevant in a circuit court adoption proceeding.

---

59, 591 A.2d 468, 474, 478 (1991). It is relevant in an adoption case, however, only to the extent that it impacts upon the best interests of the child; it is not relevant as a wholly separate matter.

The majority further argues that an ICPC placement is pertinent in an adoption proceeding by citing Code (1984, 1991 Cum.Supp.), § 5–501 *et seq.*, of the Family Law Article which deals with foster care placement by child placement agencies and with the licensing of child care facilities. Subtitle five of the Family Law Article does not involve ICPC placements. Moreover, § 5–507(c), upon which the majority relies for asserting that this child was unlawfully placed, is a limitation on the exception to the licensing requirement for parents who wish to place their children in foster care for an adoption. These licensing requirements do not apply to independent adoptions such as the one in this case.

Moreover, the majority's directive in this case for retroactive compliance with the ICPC does not square with the adoption statutes and rules. As indicated previously, by retroactive compliance with the ICPC the majority presumably intends that the circuit court require an investigation and recommendation by the Maryland compact office. The adoption statutes, however, already provide for investigations and evaluations in connection with petitions for adoption. Code (1984, 1991 Cum.Supp.), § 5–312 of the Family Law Article. Maryland Rule D75 b authorizes the court to order investigations in an adoption proceeding even when an investigation is not required by § 5–312 of the Family Law Article. Attached to the Circuit Court for Montgomery County is the Office of the Circuit Court Investigators which conducts an investigation and submits a report in virtually all independent adoption proceedings like the one now before us. Does the majority in this case intend that there be dual investigations and reports, both by the Maryland compact office and the Office of the Circuit Court Investigators? This would be a waste of governmental resources and serve no useful purpose. Furthermore, no useful purpose would be served by substituting an investigation by the Maryland compact office for one by the Office of the Circuit Court Investigators. It is obviously the latter Office which has the experience and which, under the law, is supposed to conduct pre-adoption investigations for the circuit court.

This Court has pointed out on numerous occasions that adoption is not a common law proceeding; it exists entirely because of statutes and is governed by the adoption statutes. *See, e.g., Stambaugh v. Child Support Admin.*, 323 Md. 106, 110, 591 A.2d 501, 503 (1991); *In re Adoption No. 9979, supra*, 323 Md. at 43, 58, 591 A.2d at 470, 477; *Carroll County v. Edelmann*, 320 Md. 150, 171–176, 577 A.2d 14, 24–26 (1990); *In re Lynn M., supra*, 312 Md. at 463, 540 A.2d at 800; *McGarvey v. State*, 311 Md. 233, 236, 533 A.2d 690, 691 (1987); *Bridges v. Nicely*, 304 Md. 1, 4, 497 A.2d 142, 143 (1985). As stated in *Spencer v. Franks*,

173 Md. 73, 81, 195 A. 306, 309 (1937), in an adoption proceeding "the measure of the chancellor's authority is the [adoption] statute." *See Dawson v. Eversberg,* 257 Md. 308, 312, 262 A.2d 729, 731 (1970); *Anderson v. Barkman,* 195 Md. 94, 98–99, 72 A.2d 709, 711 (1950); *Ex parte Lagumis,* 186 Md. 97, 102, 46 A.2d 189, 191 (1946); *Alston v. Thomas,* 161 Md. 617, 621, 158 A. 24, 25–26 (1932).

In addition, the statutory adoption proceeding involves a limited matter, namely the status of the person whose adoption is sought. *In re Adoption No. 9979, supra,* 323 Md. at 58, 591 A.2d at 477 (concurring opinion); *Spencer v. Franks, supra,* 173 Md. at 83, 195 A. at 310; *Waller v. Ellis, supra,* 169 Md. at 25, 179 A. at 293. And, as mentioned earlier, in a child adoption proceeding the underlying issue before the circuit court is whether it is in the best interests of the child to change the child's status by granting the adoption petition.

In light of the above-summarized principles, this Court has consistently taken the position that a circuit court in an adoption proceeding ordinarily should not deal with matters other than whether the adoption petition should be granted under the requirements of the adoption statutes. The Court explained in *Spencer v. Franks, supra,* 173 Md. at 81–82, 195 A. at 309–310, as follows:

"The power to decree an adoption did not exist at common law, and is purely a creation of statute. *Hillers v. Taylor,* 108 Md. 148, 155, 156, 69 A. 715 [1908]; *Zimmerman v. Thomas,* 152 Md. 263, 265, 136 A. 637 [1927]. So, the measure of the chancellor's authority is the statute. The statute, however, confers jurisdiction with respect to the single subject matter of adoption, with a permitted change of the child's name, if the petition contains a prayer to that effect. The record shows that all the requirements of the statute were satisfied for the passage of a decree declaring the minor child the adopted child of the petitioners, with a change of name. *Backus v. Reynolds,* 159 Md. 601, 152 A. 109 [1930]. The statute authorized no other decree...."

*See In re Adoption No. 9979, supra,* 323 Md. at 59–60, 591 A.2d at 478; *Falck v. Chadwick,* 190 Md. 461, 467, 59 A.2d 187, 189 (1948); *Waller v. Ellis, supra,* 169 Md. at 25, 179 A. at 293.[9]

The majority's directive in the present case that there be retroactive compliance with the ICPC is inconsistent with the holding of *Spencer v. Franks, supra,* and other cases. The directive is not in accordance with any requirement set forth in the adoption statutes. If the circuit court is of the view that an adoption decree, as requested by the petitioners and the natural parents, is in the child's best interests, the court should grant the petition for adoption regardless of any retroactive compliance with the ICPC. The majority's desire to do something about the alleged violation of the ICPC is no reason to inject the matter into this adoption case and to have the adoption decision depend on anything other than the best interests of the child. A failure to act promptly on the adoption petition in accordance with the best interests of this child, and holding the status of this child hostage in order to vindicate the ICPC, cannot be reconciled with the adoption statutes, with this Court's opinions, or with common sense.[10]

---

9. The majority accuses this opinion of taking the same position as the circuit court took in this case, namely that the court's authority is limited to granting or denying the adoption petition. Obviously, a circuit court has the authority under the adoption statutes and accompanying rules to address issues related to and preliminary to the adoption. *See* Maryland Rules D71–D80. Nevertheless, the fact that the circuit court generally has equitable jurisdiction does not mean that, in an adoption case, it is ordinarily appropriate for the court to go beyond the authority granted in the adoption statutes and in the rules. The majority's holding to the contrary overrules sub silentio *Spencer v. Franks, supra,* and other Maryland cases.

10. In addition to the directive for retroactive compliance with the ICPC, the majority opinion also states that if the circuit court decides that adoption is not in order, the court should "consider whether some action should be taken to assure the child's needs will be met until a permanent resolution can be achieved." This directive also appears to violate the principle set forth in *Spencer v. Franks* and other cases that a court in an adoption proceeding should not become involved in separate matters not provided for in the adoption statutes.

The clear majority of cases dealing with the effect of an ICPC violation in an adoption proceeding take the position that the grant or denial of the adoption petition should depend upon the best interests of the child regardless of the earlier ICPC violation in connection with placement. Moreover, no adoption case cited by the majority, and no appellate opinion in any adoption case of which I am aware, requires retroactive compliance with the ICPC.[11] For example, in *State of Fla., DHRS v. Thornton, supra,* 396 S.E.2d at 479–482, the Supreme Court of Appeals of West Virginia held that even if the trial court in an adoption case concludes that there had been a violation of the ICPC, the trial court's decision must be based on the best interest of the child. The West Virginia court went on (*id.* at 481–482):

"By this holding, we certainly do not mean to denigrate the ICPC or its importance. We merely recognize that when the facts of a case, such as those present here, compel the exercise of our *parens patriae* duty to protect a child's best interest, that duty outweighs the competing interests of abiding by a strict and uncompromising reverence to the Compact...."

In *Matter of Adoption of Calynn M.G.,* 137 Misc.2d 1005, 1006, 523 N.Y.S.2d 729, 730 (1987), the New York court explained:

"As often happens, children are placed from one Compact State into another without observing the Compact procedures.... Rather than leaving this child's future unsettled and since the natural mother's whereabouts are unknown, the best interests of the child dictate that the child be permitted to remain with the adoptive parents in

---

**11.** As authority for its directive of retroactive compliance with the ICPC, the majority cites B. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb.L.Rev. 292, 306–307 (1989). Professor Hartfield at that point cites no adoption case in support of her statement that retroactive compliance with the ICPC is an option "frequently chosen."

Nassau County and that the necessary steps be taken to finalize the adoption."

The same court stated in another case (*Matter of Adoption of Baby Boy M.G.*, 135 Misc.2d 252, 257, 515 N.Y.S.2d 198, 201 (1987)):

"Except for failing to get the approval of the Interstate Compact Administrator, in all other respects the petitioners have complied with New York Law.

\* \* \* \* \* \*

"Based upon the record presently before it, the court finds it is at this juncture to make its determination based on the best interest of its ward and that the best interests of the child will be served by permitting him to remain with the adoptive parents in Nassau County and grants the application for adoption."

*See also Matter of Adoption of Baby "E"*, 104 Misc.2d 185, 191–193, 427 N.Y.S.2d 705, 711–712 (1980). *But cf. Matter of Adoption of Jon K.*, 141 Misc.2d 949, 953, 535 N.Y.S.2d 660, 662 (1988); *Matter of Adoption of Male Infant D.*, 137 Misc.2d 1016, 1022–1023, 523 N.Y.S.2d 369, 373–374 (1987).[12]

---

**12.** The only appellate case containing any support for the notion that a violation of the ICPC is relevant in an adoption proceeding is the case cited and quoted in the majority's opinion, *Matter of Adoption of T.M.M.*, 186 Mont. 460, 608 P.2d 130 (1980). In that case, however, the natural mother was contesting the adoption and seeking to revoke her consent, and the Montana court held that the ICPC violation was sufficient grounds for the natural mother to revoke her consent. Contrary to the implication in the majority's opinion, the Montana court did not hold that a court, as a sanction, could revoke consent without the natural parent's request to do so. In the case before us, the natural mother is not contesting the adoption or attempting to revoke her consent. The Montana case, therefore, does not furnish support for the majority's "directives" in the case at bar. *See also* the later Montana case, *Matter of Male Child Born July 15, 1985*, 221 Mont. 309, 718 P.2d 660 (1986).

With regard to the Montana opinion in *Matter of Adoption of T.M.M., supra,* Professor Hartfield points out (B. Hartfield, *supra,* at 321):

"Thus, while *T.M.M.* is the only one of the cases in which the adoption was blocked, it is also the only one of the cases in which the issue of ICPC noncompliance was reached at a procedural juncture where the best interests standard was not considered."

Consequently, the directives contained in the majority's opinion find little or no support in the reported adoption cases involving violations of the ICPC.

## C.

Finally, I see absolutely no reason for the majority's express directives concerning the consents of the natural parents and an opportunity to have revoked those consents. There has been no indication in this case that the consents were not voluntary or that the natural parents lacked an opportunity to revoke the consents. In fact, the matter is premature. If the investigation to be ordered by the circuit court pursuant to Rule D75 b discloses a problem in connection with the natural parents' consents, the circuit court will then deal with it just as in any other adoption case. If the natural parents have moved and cannot be located, however, is the adoption petition to be denied because of noncompliance with the majority's directives? Neither the provisions of the adoption statute nor this Court's opinions furnish any support for the majority's explicit directives regarding the natural parents' consents.

This case should be treated like any other adoption proceeding, with the circuit court, after any investigation ordered under Rule D75 b, deciding whether or not to grant the petition in light of the best interests of the child.

Judge RODOWSKY has authorized me to state that he concurs with the views expressed herein.